**F I L E D**
United States Court of Appeals
Tenth Circuit

**SEP 2 1998**

**PATRICK FISHER**
Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROMAN STERLIN, on behalf of
himself and all others similarly
situated,

       Plaintiff-Appellant,

v.

BIOMUNE SYSTEMS; DAVID
DERRICK; AARON GOLD;
CHARLES J. QUANTZ; JACK
SOLOMON; THE INSTITUTE FOR
SOCIAL AND SCIENTIFIC
DEVELOPMENT; GENESIS
INVESTMENT,

       Defendants-Appellees.

No. 97-4074

---

Appeal from the United States District Court
for the District of Utah
(D.C. No. 95-CV-944)

---

Joel Seligman, Dean of The University of Arizona College of Law, Tucson,
Arizona, (Edward LaBaton, Lynda J. Grant, James M. Strauss of Goodkind,
LaBaton, Rudoff & Sucharow, LLP, New York, New York, and Thomas R.
Karrenberg and John T. Anderson of Anderson & Karrenberg, Salt Lake City,
Utah, with him on the briefs) for Plaintiff-Appellant.

J. Michael Bailey, of Parsons, Behle & Latimer, Salt Lake City, Utah, and Helen
L. Duncan, of LeBoeuf, Lamb, Greene & MacRae, LLP, Los Angeles, California,

(J. Gordon Hansen, Parsons, Behle & Latimer, Salt Lake City, Utah, on the brief for Defendants-Appellees Genesis Investment Corporation and Jack Solomon; Peter N. Greenfeld, of LeBoeuf, Lamb, Greene & MacRae, LLP, on the brief for Defendants-Appellees Biomune Systems, Inc., David Derrick, Dr. Aaron Gold and Charles J. Quantz; and Blake T. Ostler of Burbidge, Carnahan, Ostler & White, Salt Lake City, Utah, on the brief for Defendant-Appellee The Institute for Social and Scientific Development) for Defendants-Appellees.

Before **ANDERSON, BALDOCK,** and **MURPHY,** Circuit Judges.

**MURPHY**, Circuit Judge.

Appellant Roman Sterlin ("Plaintiff") brought this securities fraud class action suit against Biomune Systems, Inc. ("Biomune"), David Derrick, Aaron Gold, Charles J. Quantz, Jack Solomon, Genesis Investment Corporation ("Genesis"), and the Institute for Social and Scientific Development ("Institute") (collectively, "Defendants"). The district court dismissed the action, concluding that Plaintiff's claims were barred by the statute of limitations. From this dismissal, Plaintiff appeals. This court reverses and remands.

## I. BACKGROUND

Biomune is a biotech company which, during the relevant time period, was developing a protein called Immuno-C to be used in enhancing human immune systems. David Derrick was Biomune's President, CEO, Chairman of the Board, and main spokesperson. Aaron Gold and Charles Quantz were directors of

Biomune. Jack Solomon founded Biomune, the Institute, and Genesis, and was a member of Biomune's Business Advisory Board. Genesis manages Genesis Trust, whose beneficiaries are Solomon's family members. Genesis Trust was at one time Biomune's largest shareholder. Both Derrick and Gold were directors of Genesis. The Institute, a Utah corporation, was also a shareholder of Biomune. Gold served as a director of the Institute.

Plaintiff asserts this "action arises from a fraud of massive proportions," generally consisting of a "scheme to obtain Biomune's listing on NASDAQ, manipulate Biomune's finances and inflate the price of Biomune stock in order to dump thousands of Biomune shares on the market and earn million[s] of dollars in profits." Plaintiff's specific allegations in the Amended Complaint fall into two general categories: those concerning Biomune's NASDAQ listing and those concerning Biomune's alleged misrepresentations regarding the efficacy of Immuno-C.[1]

**NASDAQ Listing.** Plaintiff alleges that Biomune faced two obstacles in its attempt to obtain a NASDAQ listing. First, Biomune had to convince the Securities and Exchange Commission ("SEC") that Solomon, who was subject to

---

[1]Because this case was dismissed under Rule 12(b), we consider all facts in the Amended Complaint to be true and construe them in the light most favorable to Plaintiff. *See Edwards v. International Union, United Plant Guard Workers of Am.*, 46 F.3d 1047, 1050 (10th Cir. 1995).

a consent decree for previous securities violations, did not maintain control over the company. Second, Biomune had to sufficiently increase its capital and surplus so that it could qualify for listing.

On March 7, 1994, NASDAQ notified Biomune that it was deferring consideration of its application pending a review by the NASDAQ Listing Qualifications Committee. NASDAQ was concerned with disciplinary actions taken against "a principal shareholder," which Plaintiff alleges was Solomon. According to Plaintiff, Derrick drafted numerous affidavits, executed by himself and Gold, falsely attesting that Solomon did not maintain a control relationship with Biomune.

With respect to the manipulation of Biomune's capital and surplus, Plaintiff alleges that a "fraud network," consisting of relatives and friends of Solomon and Derrick, effectuated a "cleanup" of Biomune's balance sheet. Plaintiff alleges this plan took place in three parts during mid to late 1993. The first part involved an illegal Regulation S[2] offering of securities to increase Biomune's capital and surplus. The second part of the plan consisted of Biomune's purchase of Furtek Technologies from Brian Furtek, a long-time friend of Derrick, at an inflated price in an attempt to increase Biomune's asset base. The third and final part was

---

[2]Regulation S provides generally that offers or sales of securities that occur outside the United States are exempt from the registration requirements of § 5 of the Securities Act of 1933. *See* 17 C.F.R. §§ 230.901-.904.

intended to eliminate Biomune's long-term debt by entering into a phony settlement agreement with Genesis Trust. Plaintiff alleges that all of these transactions were entered into for the purpose of manipulating Biomune's finances so that Biomune could obtain a NASDAQ listing. Plaintiff further alleges that during 1993 and 1994, Defendants made false and misleading statements regarding the financial stability and commercial success of Biomune.

**Immuno-C Misrepresentations**. Plaintiff alleges that in late 1993, Biomune retained Dr. Stephen Upton from the University of Kansas to perform Immuno-C testing on mice (the "Upton Study"). Plaintiff further alleges that Dr. Upton's work was preliminary and contained a number of biases. Although several tests were unsuccessful, in one preliminary test Dr. Upton found that Immuno-C seemed to reduce the parasite level in mice, indicating that Immuno-C may be effective in the treatment of intestinal disorders. Plaintiff alleges that beginning with a press release on March 21, 1994, Defendants "launched their series of false and misleading announcements about the efficacy of Immuno-C based upon Dr. Upton's results."[3]

---

[3]Plaintiff specifically alleges that Defendants disseminated false information concerning the Upton Study in the following disclosures during 1994: March 21 press release; April 12 package to investors; April 12 Dow Jones financial newswire; May "dear shareholder" letters; May 23 press release; June 7 research report; June 15 press release; Form 8-KSB filed June 27; July 18 press release; August "dear shareholder" letters; August 11 press release; Form 10-QSB
(continued...)

Plaintiff further alleges that in late June or early July 1994, Defendants retained Dr. Mark Healey to perform additional testing of Immuno-C on mice. Dr. Healey completed his testing, which included both in vitro and in vivo tests, in early September 1994. The in vivo tests indicated that Immuno-C "did not demonstrate therapeutic efficacy," though Dr. Healey suggested that further in vivo tests be performed. Dr. Healey's in vitro tests, however, confirmed that Immuno-C may be effective, though once again he recommended that further testing be done.

Despite Dr. Healey's recommendations, Defendants decided not to proceed with additional in vivo testing nor did they immediately disclose the results of the in vivo studies. Instead, Plaintiff alleges, Defendants disseminated several press releases emphasizing and exaggerating the importance of Dr. Upton's preliminary study results and Dr. Healey's in vitro test results. Plaintiff further alleges that as a consequence of Defendants' misleading statements, Biomune's stock consistently traded at over $12.00 per share (pre-split).

On January 13, 1995, Biomune filed its Form 10-KSB for the fiscal year ending September 30, 1994. In the Form 10-K, Biomune disclosed the results of

---

[3](...continued)
filed August 15; September 21 and 22 press releases; October 12 press release; and November 3 "dear shareholder" letter.

-6-

the Healey in vivo study. Plaintiff alleges that as a result of this disclosure, Biomune's stock fell to $7.50 per share (pre-split) and has never recovered.

On October 12, 1995, Plaintiff brought this class action Complaint[4] on behalf of two classes: all persons who purchased Biomune common stock during the period September 15, 1993 through January 12, 1995 ("fraud class"); and all persons who purchased Biomune common stock contemporaneously with the sales of Biomune stock by Defendants Derrick, Genesis, and the Institute ("insider trading class"). In Count I, against all defendants, Plaintiff alleges a violation of § 10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder. In Count II, against Derrick, Gold, Quantz, and Solomon, Plaintiff alleges that each individual defendant is a control person of Biomune and is therefore liable under § 20(a) of the 1934 Act for the allegedly fraudulent conduct of Biomune. Count III, against Derrick, Genesis, and the Institute, alleges a violation of § 10(b) and Rule 10b-5 based on the defendants' conduct in their positions as officers, advisors, and/or major stockholders. Finally, Count IV, also against Derrick, Genesis, and the Institute, alleges a

---

[4]Plaintiff filed his initial Complaint on October 12, 1995, and, after a limited merits discovery, filed his Amended Complaint on August 5, 1996. Unless otherwise noted, all references to Plaintiff's "Complaint" refer to his Amended Complaint.

violation of § 20A of the 1934 Act based on the defendants' alleged insider trading.

After Plaintiff filed his Complaint, Defendants moved to dismiss, arguing, *inter alia*, the suit was barred by the applicable one-year statute of limitations. The district court agreed and dismissed the action. *See Sterlin v. Biomune Sys., Inc.*, 960 F. Supp. 1531 (D. Utah 1997). The district court concluded that an article published in *Barron's* on August 1, 1994, which was generally critical of Biomune and its founders, put Plaintiff on "inquiry notice," thus commencing the one-year limitations period. *See id.* at 1537. Because he did not file within one year from the date the article was published, the district court concluded that

Plaintiff's claims were time barred.[5]  *See id.*  Plaintiff appeals, arguing his

Complaint was timely filed.

## II.  DISCUSSION

This court reviews de novo the district court's determination that Plaintiff's

claims are barred by the statute of limitations.  *See Industrial Constructors Corp.

v. United States Bureau of Reclamation*, 15 F.3d 963, 967 (10th Cir. 1994).  In

---

[5]The district court dismissed all of Plaintiff's claims against all the
defendants, concluding the claims were barred by the one-year limitations period
applicable for § 10(b) claims.  *See Sterlin v. Biomune Sys., Inc.*, 960 F. Supp.
1531, 1537 (D. Utah 1997).  As discussed, in addition to Plaintiff's § 10(b) claims
against Defendants, Plaintiff also brought an insider trading claim under § 20A of
the 1934 Act against Derrick, Genesis, and the Institute.  Section 20A provides:

> Any person who violates any provision of this chapter or the rules or
> regulations thereunder by purchasing or selling a security while in
> possession of material, nonpublic information shall be liable in an
> action . . . to any person who, contemporaneously with the purchase
> or sale of securities that is the subject of such violation, has
> purchased . . . or sold . . . securities of the same class.

15 U.S.C. § 78t-1(a).  Section 20A further provides that "[n]o action may be
brought under this section more than 5 years after the date of the last transaction
that is the subject of the violation."  *Id.* § 78t-1(b)(4).  Courts have interpreted
§ 20A as requiring the plaintiff to plead a predicate violation of the 1934 Act or
its rules and regulations.  *See, e.g.*, *Jackson Nat'l Life Ins. Co. v. Merrill Lynch &
Co.*, 32 F.3d 697, 703 (2d Cir. 1994); *Halkin v. Verifone Inc. (In re Verifone Sec.
Litig.)*, 11 F.3d 865, 872 (9th Cir. 1993).

The district court apparently dismissed Plaintiff's § 20A claim because the
predicate offenses under the 1934 Act, namely the § 10(b) claims, were dismissed
as time barred.  Plaintiff has not argued on appeal that his § 20A claim should
survive even if the § 10(b) claims are ultimately dismissed.  In light of our
conclusion that this case must be remanded for the district court to determine
whether Plaintiff's § 10(b) claims were timely filed under the standard announced
herein, we need not discuss whether his § 20A claim should survive the dismissal
of his § 10(b) claims.

conducting our review, we accept all well-pleaded allegations in the Complaint as true and construe them in the light most favorable to Plaintiff. *See Edwards v. International Union, United Plant Guard Workers of Am.*, 46 F.3d 1047, 1050 (10th Cir. 1995).

In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991), the Supreme Court addressed the proper limitations period for § 10(b) and Rule 10b-5 claims. The Court first noted that because private causes of action under § 10(b) are of judicial creation, there is no statutory period of limitation. *See id.* at 358-59. The Court then concluded that a uniform federal statute of limitations should apply to § 10(b) claims.[6] *See id.* at 362. In determining the proper length of the limitations period, the Court rejected the SEC's contention that the five-year period under § 20A of the 1934 Act should apply. *See id.* at 361. The Court opted instead for the one-year/three-year structure contained in the Securities Act of 1933 ("1933 Act") and the 1934 Act.[7] *See id.* at 362. The

---

[6]Prior to the Supreme Court's decision in *Lampf*, numerous circuits, including this circuit, applied a state limitations period to § 10(b) claims. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 354 & n.1 (1991) (discussing split among circuits). Federal law, however, including federal equitable tolling principles, determined when the state statute of limitations period accrued. *See Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 651 F.2d 687, 691 (10th Cir. 1981).

[7]The Court specifically cited § 9(e) and § 18(c) of the 1934 Act and § 13 of the 1933 Act. *See Lampf*, 501 U.S. at 360 nn.6-7, 362. Section 9(e) provides: "No action shall be maintained to enforce any liability created under this section,
(continued...)

Court therefore concluded that actions under § 10(b) "must be commenced within

one year after the discovery of the facts constituting the violation and within three

years after such violation." *Id.* at 364.

The Court rejected the plaintiffs' argument that the applicable limitations

_____

[7](...continued)
unless brought within one year after the discovery of the facts constituting the
violation and within three years after such violation." 15 U.S.C. § 78i(e).
Section 18(c) is virtually identical to § 9(e). *See id.* § 78r(c). Section 13
provides, in relevant part:

> No action shall be maintained to enforce any liability created under
> section 77k or 77*l*(2) of this title unless brought within one year after
> the discovery of the untrue statement or the omission, or after such
> discovery should have been made by the exercise of reasonable
> diligence . . . . In no event shall any such action be brought to
> enforce a liability created under section 77k or 77*l*(1) of this title
> more than three years after the security was bona fide offered to the
> public, or under section 77*l*(2) of this title more than three years after
> the sale.

*Id.* § 77m. The Court noted that to the extent the slight distinctions in
terminology of the various periods might in the future prove significant, it
selected the language of § 9(e) of the 1934 Act as the governing standard for an
action under § 10(b). *See Lampf*, 501 U.S. at 364 n.9.

The one-year/three-year structure adopted by the *Lampf* Court thus
incorporates a statute of limitations (one year from date of discovery) framed by a
statute of repose (three years from date of violation). *See Anixter v. Home-Stake
Prod. Co. [Anixter I]*, 939 F.2d 1420, 1434 (10th Cir.), *amended on reh'g*, 947
F.2d 897 (10th Cir. 1991), *vacated sub nom. Dennler v. Trippet*, 503 U.S. 978
(1992).

period must be subject to the doctrine of equitable tolling.[8]  *See id.* at 363.  Under

that  doctrine,

> "where the party injured by the fraud remains in ignorance of it
> without any fault or want of diligence or care on his part, the bar of
> the statute does not begin to run until the fraud is discovered, though
> there be no special circumstances or efforts on the part of the party
> committing the fraud to conceal it from the knowledge of the other
> party."

*Id.* (quoting *Bailey v. Glover*, 21 Wall. 342, 348 (1875)).  Although the Court

recognized that "[t]ime requirements in lawsuits . . . are customarily subject to

'equitable tolling,'" the Court determined that the doctrine is "fundamentally

inconsistent" with the one-year/three-year structure.  *Id.* (alteration and ellipses in

original) (quoting *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95

(1990) (internal quotations omitted)).  Because the one-year period, "by its terms,

begins after discovery of the facts constituting the violation," the Court reasoned

that tolling is "unnecessary."  *Id.*  Further, because the three-year period is a

---

[8]We note that the term "tolling" means "'to suspend or stop temporarily,'"
whereas the phrase "a cause of action accrues" refers to "'when a suit may be
maintained thereon.'"  *Ebrahimi v. E.F. Hutton & Co., Inc.*, 852 F.2d 516, 520
n.6 (10th Cir. 1988) (quoting Black's Law Dictionary 1334, 19 (5th ed. 1979)).
The federal equitable tolling doctrine, however, "is at times misnamed because it
often provides a rule for determining when the limitation period accrues."  *Id.*

statute of repose,[9] the purpose of which is to "serve as a cutoff," equitable tolling may not be applied to extend that period. *Id.*

Shortly after the Supreme Court's decision in *Lampf*, this court stated that the one-year discovery period set forth in *Lampf* commences when the plaintiff is put on "inquiry notice" of possible misrepresentations. *Anixter v. Home-Stake Prod. Co. [Anixter I]*, 939 F.2d 1420, 1437 (10th Cir.), *amended on reh'g*, 947 F.2d 897 (10th Cir. 1991), *vacated sub nom. Dennler v. Trippet*, 503 U.S. 978 (1992). The court noted that those facts triggering inquiry notice have been characterized as "'sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale.'" *Id.* (quoting *Cook v. Avien, Inc.*, 573 F.2d 685, 697 (1st Cir. 1978)).

## A.    Proceedings Below

The district court concluded that an article published in *Barron's* on August 1, 1994, put Plaintiff on inquiry notice, thus commencing the one-year statute of limitations period. *See Sterlin*, 960 F. Supp. at 1537. The *Barron's* article expressed doubt about the veracity of Biomune's claims regarding Immuno-C and

---

[9]A statute of repose "runs from a fixed date readily determinable by the defendant," thus serving the need for finality. *Caviness v. Derand Resources Corp.*, 983 F.2d 1295, 1300 n.7 (4th Cir. 1993).

-13-

was generally critical of Biomune's founders. *See id.* (citing Kathryn M. Welling, *A Question of Immunity*, *Barron's*, Aug. 1, 1994, at 5, 5-6).

Plaintiff argues the district court erred in concluding the *Barron's* article put him on inquiry notice of his claims. Among other things, Plaintiff argues that because he could not have discovered the results of the Healey study, and thus Defendants' misrepresentations concerning the efficacy of Immuno-C, until Defendants publicly disclosed the Healey study results in January 1995, he could not have been on notice of his claims as of August 1, 1994, the date the article was published. In other words, Plaintiff essentially argues that inquiry notice cannot exist until the facts underlying the cause of action are discoverable. Defendants, on the other hand, contend that the one-year statute of limitations period commences upon inquiry notice, without regard to when a plaintiff could reasonably have discovered the facts underlying his claims. Both arguments find support in circuit case law and, more specifically, in Tenth Circuit case law.

**B.     Tenth Circuit Case Law**

On its face, the *Anixter I* opinion seems to support Defendants' argument that the one-year limitations period begins to run when the plaintiff is placed on inquiry notice, regardless of whether an inquiry would have borne fruit. A closer reading of the opinion, however, coupled with subsequent opinions in the *Anixter* line of cases, suggests that inquiry notice alone may not be the determinative

factor, at least when a reasonable investor could not reasonably have discovered the facts underlying the alleged fraud until some time after being placed on inquiry notice. Moreover, *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246 (10th Cir. 1997), a 1997 decision by this court, supports the rationale behind Plaintiff's argument.

The plaintiffs in *Anixter I* had invested in various oil and gas production programs, known as Program Operating Corporations ("POCs"), with the expectation of receiving not only a return on their investment but also tax benefits through individual deductions of intangible drilling costs. *See Anixter I*, 939 F.2d at 1430. The POCs were formed annually and were separately registered with the SEC. *See id.* The plaintiffs alleged that contrary to the defendants' representations, their investments were not directed at developing oil property but were instead distributed to subsequent investors in the form of Ponzi payments. *See id.* The plaintiffs alleged various violations of the federal securities laws based on the defendants' conduct. *See id.* at 1429. The district court certified nine separate plaintiff classes, representing investors in the 1964-1972 POCs. *See id.* at 1430, 1436-37. A jury found in favor of the plaintiffs and awarded damages of approximately $130 million. *See id.* at 1430.

On appeal, the *Anixter I* court first held that the claims of the 1964-1969 classes were barred by the three-year statute of repose. *See id.* at 1436. The court

then considered whether the one-year statute of limitations barred the claims of the 1970-1972 classes. *See id.* at 1440.

In determining when the one-year discovery period accrued for purposes of the 1970-1972 classes, the court stated that "[n]otice is the key to our analysis, and merely 'inquiry notice' will do."[10] *Id.* at 1437. Accordingly, the one-year period "does not 'commence only when a plaintiff has full knowledge of the existence of a claim. On the contrary, the one-year limitations period begins to run even when a plaintiff is placed on "inquiry notice" of possible misrepresentations.'" *Id.* (quoting *DeBruyne v. Equitable Life Assurance Soc'y of the United States*, 920 F.2d 457, 466 (7th Cir. 1990)).

---

[10]The *Anixter I* court initially discussed whether the plaintiffs' § 11 and § 12 claims were timely filed under the one-year/three-year limitations period of § 13 of the 1933 Act. *See Anixter I*, 939 F.2d at 1433-40. After concluding those claims were untimely under § 13, the court then discussed whether the plaintiffs' § 10(b) claims were similarly barred. The court held the claims were barred "based on [its] prior discussion of section 13 to plaintiffs' express causes of action." *Id.* at 1441-42. In its opinion partially granting the plaintiffs' petition for rehearing, the court clarified that, in accordance with the Supreme Court's decision in *Lampf*, the plaintiffs' § 10(b) claims were subject to the one-year/three-year limitations period of § 9(e) of the 1934 Act rather than § 13 of the 1933 Act. *See Anixter v. Home-Stake Prod. Co. [Anixter II]*, 947 F.2d 897, 899 (10th Cir. 1991), *vacated sub nom. Dennler v. Trippet*, 503 U.S. 978 (1992). The court held, however, that the analysis of when the limitations period accrues is the same under § 9(e) as under § 13. *See id.* at 899. In reaching this conclusion, the court rejected the plaintiffs' argument that § 9(e) requires actual rather than inquiry notice. *See id.* The *Anixter I* court's analysis discussing the accrual of § 11 and § 12 claims under the limitations period of § 13 therefore applies to claims brought under § 10(b).

The court determined the 1970 and 1971 plaintiff classes were put on inquiry notice in early 1971 and that their claims filed March 30, 1973, were therefore barred. *See id.* at 1440. In February 1971, the SEC filed a complaint against the defendants with respect to the 1970 POC, alleging violations of the registration and antifraud provisions of the federal securities laws. *See id.* at 1430-31. Shortly thereafter, the *Wall Street Journal* published an article detailing the SEC's allegations. *See id.* at 1431. The district court ultimately ordered the defendants to make a rescission offer to all participants in the 1970 POC. *See id.* On April 30, 1971, each participant in the 1970 POC was mailed a copy of the final judgment and a rescission offer prospectus. *See id.* Participants in the 1971 POC were also informed of the rescission offer by means of the 1971 prospectus. *See id.* at 1438 n.36. In 1973, the IRS and SEC again undertook investigations of the defendants. *See id.* at 1431. In March 1973, the IRS informed the participants in the 1970 and 1971 POCs that it intended to disallow their claimed deductions for intangible drilling costs arising from the POCs based on its discovery that the defendants had not expended funds on drilling wells. *See id.* at 1438. In September 1973, the defendants filed a petition for reorganization under Chapter X of the Bankruptcy Act. *See id.* at 1431.

In holding that the claims of the 1970 and 1971 plaintiff classes were barred by the one-year limitations period, the *Anixter I* court rejected the

plaintiffs' arguments that they could not have discovered the fraud until March 1973 when the IRS informed them that the defendants had not expended funds on intangible drilling, but rather had converted the funds to its own uses. *See id.* at 1437. Instead, the court concluded the *Wall Street Journal* article, court order, and the rescission offer were sufficient to put plaintiffs on inquiry notice of their claims by April 30, 1971, thereby commencing the one-year limitations period. *See id.* at 1438, 1440. Because their complaint was not filed until March 30, 1973, almost two years later, the claims of the 1970 and 1971 plaintiff classes were barred. *See id.* at 1440.

The 1972 plaintiff class was added to the action by amendment on May 24, 1974. *See id.* The court concluded the filing of the original action on March 30, 1973 put the 1972 plaintiff class on inquiry notice, triggering the one-year statute of limitations period. *See id.* Consequently, the claims of the 1972 class were barred as well. *See id.*

The *Anixter I* court stated that the one-year statute of limitations period commenced when plaintiffs were put on inquiry notice, which the court described as sufficient facts to put a reasonable investor on notice of the possibility of fraud. *See id.* at 1437. Under a strict application of this standard, the one-year limitations period may begin to run before a reasonably diligent investor should

have discovered the facts underlying the alleged fraudulent activity.[11]  In its

opinion partially granting the plaintiffs' petition for rehearing ("*Anixter II*"),

however, the court seemed to equate inquiry notice with the time when the

plaintiffs reasonably should have discovered the facts underlying the alleged

fraud.  *See Anixter v. Home-Stake Prod. Co. [Anixter II]*, 947 F.2d 897, 899 (10th

Cir. 1991), *vacated sub nom. Dennler v. Trippet*, 503 U.S. 978 (1992).  The

*Anixter II* court stated that the "plaintiffs were required to show their complaint

was timely filed within one year of their notice of the violation, when they knew

or should have known." *Id.*  In a footnote, the court stated that the general rule

for when a cause of action accrues under federal law "is an objective test, knows

---

[11]The *Anixter I* court did not focus on when the plaintiffs should have
reasonably discovered the facts underlying the alleged fraud.  In the background
section of the opinion the court noted in passing that the *Anixter* jury had returned
interrogatories on the question of equitable tolling and further noted that the
district court held as a matter of law that the "plaintiffs did not discover nor
should have discovered by the exercise of reasonable diligence the violations until
September 1973, presumably when [the defendant company] filed for bankruptcy
reorganization." *Anixter I*, 939 F.2d at 1432-33.  In the section of the opinion
discussing when the one-year limitations period accrued, however, the court did
not discuss the interrogatories or the district court's finding.  The court seemed to
view the plaintiffs' decision to "postpone" filing suit until March 1973 as a
tactical decision. *See id.* at 1439 ("Against these representations, individual
investors made their own decisions based as much on tax considerations as
investment concerns."); *id.* at 1440 ("Although [the 1970 and 1971 class
representatives] knew about the 1971 SEC investigation and settlement, both
chose neither to investigate further nor to rescind based on personal investment
decisions.").  Not until the *Anixter IV* decision, discussed *infra*, did the court
discuss the effect of the tolling interrogatories on the statute of limitations
analysis.

or should have known; discovers or in the exercise of reasonable diligence should discover, the facts giving rise to the claim." *Id.* at 899 n.5; *see also Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1549 (10th Cir. 1996) (applying Third Circuit law and stating: "Inquiry notice of the underlying facts giving rise to a potential Rule 10b-5 cause of action is sufficient. The statute of limitations period accrued when [the plaintiff] knew or should have known of the Rule 10b-5 violation." (citation omitted)). The court concluded, however, that its "previous analysis of when plaintiffs were on notice of the violation remain[ed] applicable to their § 10(b) claims." *Anixter II*, 947 F.2d at 899.

After the *Anixter I* court dismissed the plaintiffs' § 10(b) claims as time barred under the one-year/three-year limitations period, Congress passed legislation effectively overruling the retroactive application of the Supreme Court's decision in *Lampf*. *See* FDIC Improvement Act of 1991, Pub. L. No. 102-242, § 476, 105 Stat. 2236, 2387 (codified as Securities Exchange Act of 1934 § 27A, 15 U.S.C. § 78aa-1). Under § 27A, courts were required to apply to pre-*Lampf* § 10(b) claims the limitations period applicable in the appropriate jurisdiction prior to *Lampf*. *See id.* Following passage of § 27A, the *Anixter* plaintiffs sought reinstatement of their § 10(b) claims, arguing that under Oklahoma's two-year limitations period, their claims were timely filed. *See Anixter v. Home-Stake Prod. Co. [Anixter III]*, 977 F.2d 1533, 1542 (10th Cir.),

*reh'g granted in part*, 977 F.2d 1549 (10th Cir. 1992). After concluding that § 27A was constitutional, the *Anixter III* court granted the plaintiffs' motion and reinstated their § 10(b) claims. *See id.* at 1547-48.

On petition for rehearing, however, the court determined that a remand to the district court was necessary to determine whether the 1971 plaintiff class's § 10(b) claims against the defendant law firm, which was added by amendment on May 24, 1974,[12] were timely filed in light of the court's previous determination that the plaintiffs were on inquiry notice as of April 30, 1971. *See Anixter v. Home-Stake Prod. Co. [Anixter IV]*, 977 F.2d 1549, 1551-52 (10th Cir. 1992). The *Anixter IV* court first noted that although state law determines the length of the statutory period, federal law governs when the statute begins to run. *See id.* at 1551. The court then stated that "'[t]he crucial issue of fact with respect to the commencement of the running of the applicable two-year statute of limitations is when the plaintiff actually knew, or in the exercise of reasonable diligence should have known, of the existence of the alleged fraudulent . . . activity on the part of the defendants.'" *Id.* (ellipses in original) (quoting *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168, 171 (10th Cir. 1974)). The court recognized that in the *Anixter* trial, the jury had answered a special interrogatory finding that the 1971 plaintiff class, in the exercise of reasonable diligence, could

---

[12]*See Anixter I*, 939 F.2d at 1431 n.6.

not have discovered the defendant law firm's involvement in the alleged fraud until September 1973, presumably when the defendant company filed for bankruptcy. *See id.* The court determined, however, that "[g]iven the many theories of fraudulent concealment presented to the jury and the court's instructing the jury on equitable estoppel, [it could not] say with certainty whether the jury's factual finding . . . implicitly incorporated a finding that the statute [of limitations] was equitably tolled." *Id.* The court therefore remanded to the district court to determine whether the § 10(b) claims against the law firm were timely filed. *See id*. at 1552.

Thus, although the *Anixter I* opinion on its face states that the one-year limitations period commences upon inquiry notice, or the point when a reasonable investor is put on notice of the possibility of fraud, the subsequent *Anixter* opinions[13] recognize that when the plaintiffs could not have reasonably discovered the facts underlying the alleged fraud until some period after they were put on inquiry notice, the limitations period should not begin to run upon inquiry notice.

_____

[13]In determining when the federal one-year limitations period accrued in this case, this court may look to the *Anixter IV* court's analysis of when the Oklahoma two-year statute of limitations period accrued. Although the *Anixter IV* court applied federal equitable tolling principles to determine when the state limitations period accrued, the Supreme Court noted in *Lampf* that these same principles are embodied in the federal one-year limitations period. *See Lampf*, 501 U.S. at 363 ("The 1-year period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary.").

This reading of the *Anixter* line of cases is supported by this court's recent opinion in *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246 (10th Cir. 1997).

The plaintiff in *Schwartz* filed his class action complaint on May 5, 1995, alleging violations of the federal securities laws. *See id.* at 1255. The plaintiff alleged that during 1993 and 1994 the defendants misrepresented the circumstances surrounding a potential marketing agreement with another company. *See id.* at 1249. In May 1994, the defendant company announced it had entered into discussions to amend or terminate the agreement; after the announcement, the defendant company's stock prices declined. *See id.* In considering whether the federal one-year statute of limitations barred the plaintiffs' claims, this court rejected the defendants' argument that company reports of limited success in 1993 and predictions of limited success in 1994 put the plaintiff on inquiry notice. *See id.* at 1255. Instead, the court held the action was timely filed because "[n]ot until the May 9, 1994 Form 10-Q [which first announced the defendant company was considering terminating the agreement] could plaintiff reasonably have discovered the violations." *Id.*

**C. Other Circuits' Case Law**

Cases from other circuits generally apply an inquiry notice standard[14] coupled with some form of reasonable diligence requirement in determining whether a plaintiff's securities claims are timely filed. The circuits are not consistent, however, in their determination of exactly when the one-year limitations period accrues. Moreover, this inconsistency exists not only among circuits but also within circuits.[15]

---

[14]Not all circuits have addressed whether, under the Supreme Court's analysis in *Lampf*, an inquiry notice standard, as opposed to an actual notice standard, should apply to § 10(b) claims. As discussed above, this circuit has determined that the one-year discovery period set forth in *Lampf* is subject to an inquiry notice standard. *See Anixter II*, 947 F.2d at 899. The cases discussed in this section apply an inquiry notice standard and address various securities claims under both state and federal statute of limitations periods (i.e., both pre- and post-*Lampf*). Because the cases discuss when, applying an inquiry notice standard, the applicable statute should accrue under federal law, the cases are helpful in determining when the one-year limitations period should accrue in this case.

[15]This inconsistency may be largely attributable to the fact that in many cases the court need not decide exactly when the one-year limitations period began to run, i.e., upon inquiry notice or only when the plaintiff reasonably should have discovered the facts underlying the alleged fraud. *See, e.g.*, *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 129 F.3d 222, 225 (1st Cir. 1997) (recognizing First Circuit precedent supported two different accrual dates but concluding court need not decide between dates because even assuming later accrual date, plaintiff still filed too late); *Law v. Medco Research, Inc.*, 113 F.3d 781, 785 (7th Cir. 1997) (citing Seventh Circuit cases applying inconsistent standards and noting that "none of the cases treats the difference between the two formulas as an issue," perhaps because "it made no difference in those cases or the parties had chosen not to make it an issue"). Thus, although there appears to be different standards for determining when the one-year limitations period should accrue, these differences may be more semantic than substantive.

Some courts have indicated the one-year limitations period begins to run once the plaintiff is put on inquiry notice, so long as the plaintiff could acquire actual knowledge of the facts underlying the fraudulent activity with the exercise of reasonable diligence.[16]  For example, in *Great Rivers Cooperative v. Farmland Industries, Inc.*, 120 F.3d 893 (8th Cir. 1997), the Eighth Circuit stated that "[i]nquiry notice exists when the victim is aware of facts that would lead a reasonable person to investigate and consequently acquire actual knowledge of the defendant's misrepresentations."[17]  *Id.* at 896.  Similarly, in *Caviness v. Derand Resources Corp.*, 983 F.2d 1295 (4th Cir. 1993), the Fourth Circuit, in discussing the one-year limitation period of § 13, stated that "[§ 13] provides for

---

[16]Courts generally have not specified under this standard within what time frame the plaintiff must be able to discover the facts.

[17]The opinion in *Great Rivers* could also be read as holding that the one-year limitations period does not begin to run until the plaintiff reasonably should have discovered the facts underlying the alleged fraudulent activity.  The court first noted that a reasonable investor would have been suspicious of possible misrepresentations upon reading an article in a newsletter about a class action suit against the defendant.  *See Great Rivers Coop. v. Farmland Indus., Inc.*, 120 F.3d 893, 898 (8th Cir. 1997).  The court further determined that a reasonable investor, exercising due diligence, would have acquired actual notice of the alleged misrepresentations by contacting the representatives and attorneys of that suit. *See id.* at 898.  The court thus concluded that the plaintiff "had inquiry notice shortly after reading the article," *id.* at 899, implying that the plaintiff must be given some opportunity to actually discover the facts underlying the fraud before the statute of limitations begins to run.  *See also id.* at 896 ("[T]he one-year limitation period begins to run when the victim should have discovered the misrepresentation through the exercise of reasonable diligence.  This objective standard is commonly referred to as the doctrine of 'inquiry notice.'").

the commencement of the one-year limitations period when the plaintiff knows of the facts on which the action is based *or* has such knowledge as would put a reasonably prudent purchaser on notice to inquire, so long as that inquiry would reveal the facts on which a claim is ultimately based." *Id.* at 1303.

Other courts have indicated the one-year limitations period commences when the plaintiff is placed on inquiry notice, unless the plaintiff can show the actual exercise of reasonable diligence to discover the fraud. If the plaintiff can show the exercise of such diligence, the limitations period begins to run when the plaintiff actually discovers the facts underlying the alleged fraud. If, however, the plaintiff cannot show such actual diligence, constructive knowledge of the fraud is imputed to the plaintiff as of the date of inquiry notice. For example, in *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346 (2d Cir. 1993), the Second Circuit stated that "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Id.* at 350. The *Dodds* court further stated that the doctrine of "[e]quitable tolling will stay the running of the statute of limitations only so long as the plaintiff has exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." *Id.* (internal quotations omitted).

The Seventh Circuit, essentially merging the inquiry notice and reasonable diligence standards into one governing standard, has indicated that a plaintiff is not put on inquiry notice until the plaintiff reasonably should have discovered the fraud. *See Marks v. CDW Comupter Ctrs., Inc.*, 122 F.3d 363, 368 (7th Cir. 1997) ("[I]nquiry notice does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), to ascertain the information needed to file suit."); *see also Law v. Medco Research, Inc.*, 113 F.3d 781, 785 (7th Cir. 1997) ("[T]he plaintiff gets a year after he learned or should have learned the facts that he must know to know that he has a claim."). An earlier Seventh Circuit case, however, rejected the plaintiff's argument that "in spite of reasonable diligence, it could not discover the facts underlying the defendants' fraud" and held that the one-year limitations period began to run once the plaintiff was placed on inquiry notice of the possibility of fraud.[18] *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 610 & n.3 (7th Cir. 1995).

The First Circuit, based on the same rationale as the Seventh Circuit, has stated that while "'storm warnings' of the possibility of fraud trigger a plaintiff's

_____

[18]The *Marks* case dismissed the defendant's reliance on *Whirlpool*, reasoning that the court in *Whirlpool* was "dispos[ing] of the plaintiff's equitable tolling argument rather than addressing an inquiry notice argument." *Marks v. CDW Comupter Ctrs., Inc.*, 122 F.3d 363, 368 n.1 (7th Cir. 1997).

duty to investigate in a reasonably diligent manner, . . . his cause of action is deemed to accrue on the date when he *should have discovered* the alleged fraud." *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir. 1987) (citation omitted). In *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 129 F.3d 222 (1st Cir. 1997), however, the First Circuit stated that it "need not decide whether the statute of limitations begins to run on the date the storm warnings appear or the later date on which an inquiring investor would through reasonable diligence have discovered the fraud. The time between the two dates in most cases is not likely to be long enough to affect the outcome." *Id.* at 225 (citations omitted) (citing First Circuit cases supporting both accrual dates).

**D.    Determination of Proper Standard**

In this case the time between the date Plaintiff was allegedly placed on inquiry notice and the date Plaintiff claims he could reasonably have discovered the facts underlying the alleged fraud does affect the outcome. If this court accepts the district court's determination that Plaintiff was on inquiry notice as of August 1, 1994, the date the *Barron's* article was published, but agrees with Plaintiff that a reasonable investor should not have discovered the facts underlying the fraud until January 1995, then the timeliness of Plaintiff's October 1995 filing hinges on the resolution of whether the limitations period begins to

run when an investor is placed on inquiry notice or instead when the investor should reasonably have discovered the fraud.

This court concludes that inquiry notice, as defined by *Anixter I*, triggers an investor's duty to exercise reasonable diligence and that the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud. We reach this conclusion after a considered analysis of this circuit's precedent, other circuits' case law, and the policies underlying the securities laws.

As indicated above, language in the *Anixter* line of cases and in *Celestial Seasonings* supports our holding. *See supra* Part II.B. Further, consistent with our holding, a recent case from the Seventh Circuit has recognized that the one-year limitations period should not begin to run until a reasonable investor should have discovered the facts underlying the alleged fraudulent activity.[19] *See Marks*, 122 F.3d at 367-68. Delaying the accrual of the one-year limitations period until this time is also consistent with the Supreme Court's statement in *Lampf* that

---

[19]We recognize that our phrasing of what constitutes inquiry notice is different from that of the Seventh Circuit. That circuit apparently holds that inquiry notice does not exist until the investor is able to discover the facts underlying the fraudulent activity. *See Marks*, 122 F.3d at 368. Our holding, however, recognizes that inquiry notice, which is triggered by evidence of the possibility of fraud, may exist before a reasonable investor is able to discover the facts underlying the alleged fraud.

equitable tolling is "unnecessary" because the doctrine is already reflected in the one-year discovery period. *Lampf*, 501 U.S. at 363.

Our holding further strikes a balance between two competing policies underlying the securities laws. While we recognize there is a strong federal interest in requiring plaintiffs to file suit soon after they are put on notice of their claims, the applicable statute of limitations should not precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims. *See Anixter I*, 939 F.2d at 1440; *Law,* 113 F.3d at 786.

The purpose behind commencing the one-year limitations period upon inquiry notice is to discourage investors from adopting a wait-and-see approach. *See Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 722 (7th Cir. 1993) (stating inquiry notice standard discourages tactic of "[h]eads I win, tails you lose."); *Anixter IV*, 977 F.2d at 1552 (stating securities laws are intended "'to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act'" (quoting *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1413 (9th Cir. 1987)). Adopting inquiry notice as the point when the one-year limitations period begins to run, however, could lead to valid suits being barred because the plaintiff, although on inquiry notice, could not reasonably have discovered within

one year sufficient facts to file a suit which satisfies the particularized pleading requirements of § 9(b). The objective of encouraging investors to file suit as soon as possible is not undermined by delaying the accrual of the statute of limitations until the plaintiffs, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud.[20] Delaying the accrual of the one-year limitations period until this time does, however, ensure that plaintiffs are given the opportunity to adequately develop the facts and determine whether those facts merit bringing suit, thus giving meaning to the term "inquiry."

## E.   Application of Standard

### 1.   Inquiry Notice

The district court determined that an article published in *Barron's* on August 1, 1994, entitled "A Question of Immunity," put Plaintiff on inquiry notice of his claims. In support of its conclusion, the district court quoted the following passages from the article:

---

[20]As discussed above, some courts have indicated that a plaintiff must actually exercise due diligence in order to "toll" the one-year limitations period. *See, e.g., Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993). This court, however, has indicated that although a plaintiff has an "obligation of diligence," the plaintiff need not show the actual exercise of diligence in order to "toll" the limitations period. *Peterson, Lowry, Rall, Barber & Ross*, 651 F.2d at 693 n.10, 694-95, 695 n.16 (noting that "[e]quity's requirement that plaintiff prove *actual* diligence has survived in a few modern federal cases" but applying test based on "hypothetical diligence"). Rather, in deciding whether the statute should be tolled, it must be determined whether a "reasonably diligent plaintiff" would have discovered the fraud. *Id.* at 694.

"The story you're about to read is true.  And in its broad outlines, alas, oft-told.  Not even the names have been changed.  Maybe its retelling will protect a few innocents.

[The main body of the article is critical of Biomune's research and claims regarding the effectiveness of Immuno-C.]

Concludes Hatch, who studied under one of Biomune's founders at Brigham Young University in the mid-Seventies, 'I don't rule out the one in 100 chance that Biomune actually has something.  But if I were betting, I'd say the other 99% is going to rule.'

And that's a bet, it turns out, based on considerably more than the scientific evidence.  As Hatch knows—and anyone else who cares to take the trouble to research Biomune's corporate history can discover—ever since its December 1981 founding as New Age Corp.—the company's true raison d'etre hasn't been shrimp farming in Ecuador or tomato cultivation in Egypt or immunity enhancers or any of the other ventures it's run through.  It's been to sell shares—or, at the least, to use shares as currency to keep any number of its promoters' ventures afloat.

And who are those promoters?  The list is long and their connections colorful, but we will list only one.  Biomune founder and consultant of long-standing is a Salt Lake City philanthropist, Jack D. Solomon.  He owns no Biomune shares, according to the company's SEC filings.  But a byzantine array of entities in one way or another affiliated with Solomon own more than 35% of its stock.  As it happens, way back when—in 1983—the federal district court in Nevada permanently enjoined Solomon from violations of the registration, antifraud, stock ownership reporting and proxy solicitation provisions of the securities laws.  Without admitting or denying the charges, Solomon consented to the filing of that injunction rather than fight SEC charges that, as president and chairman of Advanced Patent Technology Inc., he had illegally sold about 8.7 million shares of unregistered stock in purported private placements between 1975 and late 1980 to raise money for APT's purchase of a Las Vegas slot machine route business and other gaming-related enterprises.  Over that span, APT's shares climbed from pennies to just under $10—and they subsequently went back to pennies, before being delisted from Nasdaq.

There's a lesson there somewhere."

-32-

*Id.* at 1533-34 (quoting Kathryn M. Welling, *A Question of Immunity*, *Barron's*, Aug. 1, 1994, at 5, 5-6).

Plaintiff argues the district court erred in concluding the *Barron's* article put him on inquiry notice. He characterizes the article as "consist[ing] primarily of sarcastic comments"[21] and asserts that nothing in the article even "raises the possibility" that Defendants made knowing misrepresentations about Immuno-C or knowingly manipulated the market for Biomune stock. With respect to the alleged misrepresentations about Immuno-C, Plaintiff contends that any storm warnings raised by the article were premature, as the article was published only nine days after the Healey study commenced and over six weeks before the Healey results became available. Likewise, with respect to the fraud claim premised on Biomune's NASDAQ listing, i.e., the illegal Regulation S offering, the acquisition of Furtek Technologies, and the settlement arrangement with Genesis, Plaintiff asserts that because the article did not even mention these transactions, "it would have been impossible" for the article to put him on notice. Finally, Plaintiff argues that two "dear shareholder" letters written by Derrick a few days after the *Barron's* article was published sufficiently negated any

---

[21]Defendants correctly note that many of these supposedly "sarcastic comments" made their way into Plaintiff's original Complaint.

suspicions raised by the article so that Plaintiff could not have been placed on inquiry notice.

Plaintiff misunderstands the nature of inquiry notice. As this court in *Anixter I* recognized, Plaintiff "'need not . . . have fully discovered the nature and extent of the fraud before [he was] on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself.'" 939 F.2d at 1438 (quoting *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802 (1st Cir. 1987)). In other words,

> "facts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence and which, if pursued, would disclose the fraud. Facts in the latter sense merely constitute objects of direct experience and, as such, may comprise rumors or vague charges if of sufficient substance to arouse suspicion."

*Cook v. Avien Inc.*, 573 F.2d 685, 697 n.25 (1st Cir. 1978) (quoting *Tobacco & Allied Stocks v. Transamerica Corp.*, 143 F. Supp. 323, 331 (D. Del. 1956)).

The district court correctly ruled that the *Barron's* article, as a whole, created sufficient "storm warnings" to put a reasonable investor on notice of the possibility of fraudulent activity. Importantly, the *Barron's* article questioned whether Biomune's purpose was to create a viable product, Immuno-C, or whether it was in business simply to "sell shares." The article pointed out that Solomon, who, according to Biomune's SEC filings, owned no stock, actually owned more than 35% of Biomune's stock through a "byzantine array of entities." This

-34-

statement related directly to Plaintiff's claim that Defendants fraudulently represented to the SEC that Solomon owned no Biomune stock in order to obtain Biomune's NASDAQ listing. The article also stated that Solomon had been permanently enjoined in 1983 from violating various provisions of the securities laws. While insufficient by itself to establish inquiry notice, Solomon's prior history may be considered in determining whether Plaintiff was on inquiry notice. *Cf. Lenz v. Associated Inns & Restaurants Co. of Am.*, 833 F. Supp. 362, 375 (S.D.N.Y. 1993) ("[A]wareness of other lawsuits or criminal fraud convictions involving a defendant puts a plaintiff on inquiry notice of the probability of fraud within another transaction involving the defendant."). The article further raised serious questions about Biomune's claims regarding the FDA approval process and expressed skepticism about Biomune's assertions regarding the efficacy of Immuno-C. Finally, as Plaintiff acknowledges in his Complaint, the market apparently took notice of the *Barron's* article, as the price of Biomune's stock "suffered a slide" after the article was published.[22] *Cf. Law*, 113 F.3d at 784

---

[22]Although the determination of whether Plaintiff was on inquiry notice is judged by an objective standard, this court notes that Plaintiff's own buying pattern of Biomune stock supports our conclusion that the *Barron's* article was sufficient to put Plaintiff on inquiry notice. In the 11 months prior to the date the article was published, Plaintiff made 10 purchases of Biomune stock totaling approximately 13,000 shares. The day the article was published, August 1, 1994, Plaintiff purchased 333.33 shares, and after that date, he purchased only 33.33 shares.

-35-

(noting that market did not respond to articles criticizing defendants and concluding that articles consisted of "premature" storm warnings).

Contrary to Plaintiff's assertions, the *Barron's* article need not discuss each and every aspect of the alleged fraudulent activity to put him on notice of the need to inquire. *See In re Valence Tech., Inc. Sec. Litig.*, 987 F. Supp. 796, 802-03 (N.D. Cal. 1997) (rejecting plaintiffs' argument that because *Forbes* article did not address core allegations, it could not have put them on inquiry notice). Rather, the article need only alert a reasonable investor to the possibility of fraud. *See Anixter I*, 939 F.2d at 1438.

Once the storm clouds gathered, the "dear shareholder" letters from Derrick refuting the claims in the article could not dissipate them.[23] *See id.* at 1438-39 & 1439 n.37 (holding rescission offer and article put plaintiffs on inquiry notice even though defendant's CEO issued assurances in response); *Great Rivers Coop.*, 120 F.3d at 898 ("[The defendant's] self-serving statements about the invalidity of the suit do not . . . negate the other pertinent information presented in the article."); *In re Valence Tech., Inc. Sec. Litig.*, 987 F. Supp. at 803-04 (noting that defendant's letter disputing substance of article "should have heightened, not alleviated, a reasonable investor's suspicion of potential fraud"); *Lenz,* 833 F.

---

[23]This court expresses no opinion on Plaintiff's argument that the "dear shareholder" letters affected his ability to discover the facts underlying the fraud.

Supp. at 376 n.12 (noting that "reassurances accompanying the relevant notice" do not "relieve[] the plaintiff of his duty to undertake reasonable inquiry").

In sum, a reasonable investor would have investigated further after reading the *Barron's* article. Contrary to Plaintiff's assertions, the "dear shareholder" letters did not relieve him of his duty to investigate. This court therefore concludes the article put Plaintiff on inquiry notice, triggering the duty to exercise reasonable diligence.

### 2. Reasonable Diligence

The district court did not address whether, in the exercise of reasonable diligence, Plaintiff should have discovered the facts underlying the alleged fraudulent activity prior to October 12, 1994, one year before he filed suit. Rather, the district court held the statute began to run on August 1, 1994, the date the *Barron's* article was published. We therefore remand to the district court to determine whether Plaintiff's Complaint was timely filed under the standard adopted herein.[24]

### III. CONCLUSION

---

[24]Defendants have advanced nine additional arguments for upholding the district court's dismissal of Plaintiff's Complaint. Because the district court concluded the Complaint was barred by the statute of limitations, it did not consider any of these arguments. This court declines to consider the arguments at this time and leaves them for the district court to address in the first instance.

Based on the foregoing discussion, this court **REVERSES** the district court's dismissal of Plaintiff's Complaint and **REMANDS** for a determination of whether, under the standard announced herein, Plaintiff's Complaint was timely filed.