Roman STERLIN, on behalf of himself and all others similarly situated, Plaintiff,

v.

BIOMUNE SYSTEMS, INC.; David Derrick; Dr. Aaron Gold; Charles J. Quantz; Jack Solomon; and the Institute for Social and Scientific Development, Defendants.

No. 2:95–CV–944G.

United States District Court, D. Utah, Central Division.

Sept. 28, 2000.

John T. Anderson of Anderson & Karrenberg, Salt Lake City, UT; Lynda Grant and David J. Goldsmith of Goodkind, Labaton, Rudoff & Sucharow, New York, NY, for Plaintiff.

Helen L. Duncan, Joseph H. Park and Kenneth L. Cannon II of LeBoeuf, Lamb, Greene & MacRae, Salt Lake City, UT, for Defendants Biomune Systems, Inc., David Derrick, Dr. Aaron Gold, and Charles J. Quantz.

J. Michael Bailey and J. Gordon Hansen of Parsons, Behle & Latimer, Salt Lake City, UT, for Defendant Jack Solomon and Genesis Investment Corporation.

Blake T. Ostler of Burbidge, Carnahan, Ostler & White, Salt Lake City, UT, for Defendant The Institute for Social and Scientific Development.

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT IN RE STATUTE OF LIMITATIONS APPLICABLE TO § 10(b) SECURITIES CLAIMS

J. THOMAS GREENE, District Judge.

This matter is before the court on Defendants' Motion for Summary Judgment in re Immuno–C, and Defendants' Motion to Dismiss Amended Complaint in re NASDAQ or in the Alternative for Summary Judgment in re NASDAQ. Plaintiff Roman Sterlin is represented by John T. Anderson of Anderson & Karrenberg and Lynda Grant and David J. Goldsmith of Goodkind, Labaton, Rudoff & Sucharow; defendants Biomune Systems, Inc., David Derrick, Dr. Aaron Gold, and Charles J. Quantz are represented by Helen L. Duncan, Joseph H. Park and Kenneth L. Cannon II of LeBoeuf, Lamb, Greene & MacRae; defendant Jack Solomon and Genesis Investment Corporation are represented by J. Michael Bailey and J. Gordon Hansen of Parsons, Behle & Latimer; and defendant The Institute for Social and Scientific Development is represented by Blake T. Ostler of Burbidge, Carnahan, Ostler & White.

The motions were extensively briefed and taken under advisement after oral argument.

### Background

This case is on remand from the Tenth Circuit concerning the applicability of the one year statute of limitations for alleged securities fraud. *Sterlin v. Biomune Sys.,* 154 F.3d 1191 (10th Cir.1998).

Originally, this court concluded that an article published in *Barron's* on August 1, 1994 [1] put plaintiff on inquiry notice and caused the one year statute of limitations to begin running on that date. *See Sterlin v. Biomune Sys., Inc.,* 960 F.Supp. 1531 (D.Utah 1997). On appeal, the 10th Circuit agreed that the *Barron's* article commenced "inquiry notice," but the case was

---

1. Kathryn Welling, *A Question of Immunity,* Barron's, August 1, 1994, 5–6. A copy of the full text of the article can be found in the district court opinion. *Sterlin v. Biomune Sys., Inc.,* 960 F.Supp. 1531 (D.Utah 1997).

remanded for the trial judge to determine "whether in the exercise of reasonable diligence, Plaintiff should have discovered the facts underlying the alleged fraudulent activity prior to October 12, 1994, one year before he filed suit." 154 F.3d at 1205. In so doing, the appeals court established a standard that "inquiry notice, as defined by *Anixter I*,[2] triggers an investor's duty to exercise reasonable diligence and the one year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the fraud." *Id.* at 1201.[3]

Since the remand, the parties have conducted substantial discovery on the statute of limitations issue. At subsequent hearings before this court, the parties presented materials outside the pleadings, both as to the so-called "Immuno–C" claim and as to the NASDAQ claim, and the court gave notice that both motions would be regarded as motions for summary judgment.[4]

### Standard for Summary Judgment

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.*

56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Weimer v. Schraeder,* 952 F.2d 336 (10th Cir.1991); *Pietrowski v. Town of Dibble,* 134 F.3d 1006 (10th Cir.1998).[5]

In this case, the Tenth Circuit has adopted an objective standard which requires determination whether, within the relevant time period, a reasonably diligent plaintiff "would have discovered the fraud."[6]

### Statement of Material Facts

Based upon the submissions of the parties and review of all relevant materials, the court finds that there is no genuine issue as to the following material facts relative to the statute of limitations:

1. Biomune Systems, Inc. ("Biomune") is a Utah corporation which at the times pertinent to the present Motions was engaged in the development of a drug called Immuno–C.[7]

2. Roman Sterlin held stock in Biomune at all times pertinent to the Motions.

3. On August 1, 1994, *Barron's* published an article by noted journalist Kathryn Welling entitled "A Question of Immunity."[8] The article set forth several statements which the 10th Circuit regarded as

**2.** *Anixter v. Home–Stake Prod. Co.,* 939 F.2d 1420 (10th Cir.1991), *amended on reh'g,* 947 F.2d 897 (10th Cir.1991), *vacated sum nom. Dennler v. Trippet,* 503 U.S. 978, 112 S.Ct. 1658, 118 L.Ed.2d 382 (1992).

**3.** The 10th Circuit recognized that this conception of when the statute begins to run is different than the law adopted in some other circuits where the statute of limitations begins to run at the same time of inquiry notice. *See Sterlin,* 154 F.3d at 1202, n. 19.

**4.** Rule 12(b) of the Federal Rules of Civil Procedure provides: "[i]f on a motion ... to dismiss ... matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment ...." Fed.R.Civ.P. 12(b).

**5.** In *Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687, 694 (10th Cir.1981), a securities fraud case, the Tenth Circuit upheld

the trial court's grant of summary judgment under the abuse of discretion standard of review.

**6.** *Sterlin v. Biomune,* 154 F.3d 1191, 1201 fn. 20.

**7.** Immuno–C is described as a whey concentrate derived from cow's milk which contains a high concentration of .antibodies and may be effective in combating cryptosporidiosis, a condition with cholera-like symptoms that is potentially fatal to those who are immune deficient, especially AIDS patients.

**8.** "The story you're about to read is true. And in its broad outlines, alas, oft-told. Not even the names have been changed. Maybe its retelling will protect a few innocents.

The company is Biomune Systems Inc., of Salt Lake City, whose shares began trading in

"red flags" sufficient to place a reasonable investor on inquiry notice. In this regard, the following quotes and references from the article put investors on notice:

a. The founder and active consultant of Biomune, Jack Solomon, previously had been enjoined permanently from violations of several provisions of the securities laws, including selling unregistered stock in private placements.[9]

b. Although Solomon apparently is not a stockholder, he was and is in a position to exercise indirect control over Biomune through his affiliations with other entities which are major stockholders.[10]

c. Since 1981, Biomune (formerly New Age Corp.) has "run through" many ventures in America and foreign countries, but its true purpose has been to sell and use shares to keep promoters' ventures afloat.[11]

d. Even though Biomune has no significant revenue generating operations it eliminated approximately $9 million in debt in large part by raising cash from private placements of stock.[12]

e. The auditors of Biomune opined in a report filed with the SEC that Biomune's ability to operate as a going concern was in doubt.[13]

f. Ms. Welling noted that public trading of Biomune stock at increasing price levels had commenced on the NASDAQ exchange, and that SEC reports containing factual material concerning Biomune's sales of private placements of stock, and

---

Nasdaq's smallcap arena only in April, ..."
See Fn. 1, *supra*. Plaintiff claims that Welling may have relied on non-public sources in the preparation of her article, arguing that if Welling used non-public sources, a reasonable investor would not have been able to substantiate the allegations made therein. Ms. Welling averred that she used only publicly available sources. Welling Decl. ¶ 4–8. The relevant inquiry is whether a prudent investor in the exercise of reasonable diligence should have discovered the facts underlying the alleged fraud from sources which could have been discovered, including publicly available sources. For purposes of the analysis herein, only publicly available sources and material facts as to which there is no genuine issue are relied upon in determining whether such an investor should have discovered the underlying facts.

9. "[In 1983] the federal district court of Nevada permanently enjoined Solomon from violations of the registration, antifraud, stock ownership reporting and proxy solicitation provisions of the securities laws. Without admitting or denying the charges, Solomon consented to the filing of that injunction rather than fight SEC charges that, as president and chairman of Advanced Patent Technology Inc., he had illegally sold about 8.7 million shares of unregistered stock in purported private placements between 1975 and late 1980 to raise money for APT's purchase of a Las Vegas slot machine route business and other gaming-related enterprises. Over that span, APT's shares climbed from pennies to just under $10–and they subsequently went back to pennies, before being delisted from Nasdaq.

There's a lesson there somewhere."

10. "[Solomon] owns no Biomune shares, according to the company's SEC filings. But a byzantine array of entities in one way or another affiliated with Solomon own more than 35% of its stock."

11. "As [one competitor] knows-and anyone else who cares to take the trouble to research Biomune's corporate history can discover-ever since its December 1981 founding as New Age Corp.-the company's true raison d'etre hasn't been shrimp farming in Ecuador or tomato cultivation in Egypt, or immunity enhancers or any of the other ventures it's run through. It's been to sell shares-or, at the least, to use shares as currency to keep any number of its promoters ventures afloat."

12. "... the company raised about $10 million from private placements of preferred shares in the past year ..." Ms. Welling states that although the most recent quarterly filing with the SEC reflected concern and "worry" by Biomune's management about lack of revenue generating operations, CEO David G. Derrick told *Barron's* that it had raised "about $9.5 million" of funds in its recent private placements and that with "virtually no debt," the company has enough cash to complete its drug development program.

13. Ms. Welling pointed out that Arthur Andersen & Co. had noted [Biomune's] lack of "revenue generating operating activities" and loss of about $9 million since its inception, and that "these matters raise substantial doubt about the company's ability to continue as a going concern."

other transactions which eliminated Biomune debt were publicly available.[14]

g. Biomune will not be able to produce income until Immuno–C is approved by the Food and Drug Administration (FDA) which, most likely, will take years rather than the 18 months projected by Biomune.[15]

h. Immuno–C is derived from bovine milk which makes it easily destroyed by stomach acids and therefore raises serious doubt that it could ever become an effective drug for treatment of humans.[16]

i. The stock of Biomune has been publicly traded since April in NASDAQ's small cap arena at increasing price levels even though no significant income was being generated.[17]

. 4. Prior to the publication of the Welling article, a "Dear Shareholder" letter from Biomune informed stockholders that Dr. Stephen Upton was conducting clinical experiments utilizing Biomune's drug Immuno–C.[18] Plaintiff was aware of and read Biomune's press release dated March 21, 1994, discussing Dr. Upton's study,[19] and made about a dozen telephone calls and spoke with Biomune's Chief Executive Officer, Executive Vice President, Chief Financial Officer and Investor Relations representative prior to August 1, 1994, the date of the *Barron*'s article. Plaintiff first began purchasing Biomune stock in 1993. He purchased 6,300 shares of Biomune stock during the period May 26, 1994 to June 3, 1994 at prices ranging from $6.5 per share to $6.83 per share.[20]

14. The Welling article called attention to the most recent quarterly report of Biomune filed with the SEC and other SEC filings, including the Arthur Andersen audit which was filed in early 1994 with Biomune's 1993 10K form. The article also alerted investors to unusually active trading of Biomune stock on the NASDAQ despite lack of revenue generating operations. *See* fn. 17, *infra*.

15. Based upon eradication rates so statistically high in animals, Biomune CEO David G. Derrick predicted that if this will repeat in humans "the drug will now virtually sail through the FDA." But Ms. Welling quoted Ladenburg Thalmann & Co. who issued a "buy" on Biomune's stock in mid-June: "Biomune has neither earnings nor potential to generate any before mid–'95–and then only if several stages of the drug approval process take place 'without delays.' " She went on to note that "[a]ccording to the Pharmaceutical Manufacturers' Association, the average new drug takes—not the 18 months Ladenburg and Biomune itself project for Immuno–C— but 8 ½ years to run the FDA gauntlet from phase I to testing in humans to final approval."

16. Welling points out that Thomas Hatch, CEO of Immucell (a competitor), regards successful testing in humans as unlikely because "our product comes from milk-and mother nature digests food products in the stomach. We have to figure out how to get it though the stomach without being degraded by the acids." Welling further quotes Hatch, who studied under one of Biomune's founders at Brigham Young University in the mid-Seventies, "I don't rule out the one in 100 chance

that Biomune actually has something. But if I were betting, I'd say the other 99% is going to rule." Ms. Welling then observes: Since Biomune's product is .likewise dairy-based, it stands to reason that when it starts testing its drug for efficacy in humans, it, too, may well run into the same problem.

17. Biomune investors "are currently valuing its roughly 21.5 million fully diluted shares at 6¼ apiece" and ". . . its fans have bid up the common from 1⅜ to as high as 7¼ (adjusted for a 3–for–1 split in June)" even though in their most recent auditor's report on Biomune, dated last Dec. 15, Arthur Andersen & Co. noted that its "revenue generating operating activities are not in place at significant levels, . . ." See Fn. 8, *supra*.

18. "In mid-April the Company announced the result of recent clinical experiments utilizing Biomune's drug Immuno–C, against cryptosporidiosis. The experiments were conducted by Dr. Stephen Upton of Kansas State University, one of the leading authorities on cryptosporidiosis. In the study, newborn mice were infected on day one with a cryptosporidium microbe and were then given a single dosage of Immuno–C on day three. By day seven, there was statistically significant eradication of the disease. This is a milestone since there is no drug currently approved that can eradicate cryptosporidiosis."

Letter from Derrick to shareholders of 5/9/94.

19. *See* Sterlin dep. at 39 and 48.

20. Plaintiff's complaint, para. 5.

5. Prior to publication of the Welling article, the identity of Dr. Allan H. Barker and Dr. Thomas Q. Garvey as Biomune Directors and scientific advisors was made known to stockholder investors.[21] Dr. Barker was Biomune's Medical Director of Clinical trials and responded to inquiries from investors and others.[22]

6. On August 1, 1994, the date of publication, Sterlin read Welling's article and telephoned Welling about the article. Ms. Welling referred Sterlin to the article itself and provided no additional information.

7. During the first week of August 1994, Sterlin contacted Biomune and spoke with Jack Solomon who assured Sterlin of the effectiveness of Immuno–C and encouraged him to buy more stock. Without any further checking Sterlin purchased 1000 additional shares of Biomune at 4.876 per share.[23]

8. On or about the first week of August 1994, Sterlin received two copies of a "Dear Shareholder" letter written by Biomune CEO, David Derrick, which denied all the statements made by Welling in the *Barron's* article.[24]

9. Dr. Mark Healey completed testing Immuno–C on or prior to September 21, 1994. A widely disseminated press release

**21.** "Also during April, we added two new directors to our Board of Directors: Drs. Allan H. Barker and Thomas Q. Garvey, both of whom have been serving on the Company's Scientific board of advisors.

Dr. Barker is a clinical Associate Professor of Internal Medicine, University of Utah College of Medicine and President of the Salt Lake Clinic Research Foundation. Dr. Barker has been the principal investigator in over a half-dozen study projects and has overseen numerous clinical trials. He is the author of over 40 books and papers, primarily on the subject of internal medicine.

Dr. Garvey is a gastroenterologist in private practice in Maryland. He was head of the Gastroenterology Division at the Food and Drug Administration for approximately five years and previous to that was with the National Institute of Health for 10 years. As a consultant to various pharmaceutical companies, he has helped in the approval process of many new drug applications; this includes writing the NDA (New Drug Application) for Zantac, the worlds single most profitable drug."
Letter from Derrick to shareholders (May 9, 1994).

**22.** Barker dep. at 10, 31, 33, 65–66.

**23.** Complaint, para. 5

**24.** "Ms. Welling points out that an 18 month approval time from filing of an IND [Investigative New Drug application] for IMMUNO–C ™ is in sharp contrast to the experience of one of Biomune's competitors, ImmuCell, which is developing a therapy similar to IMMUNO–C ™ for cryptosporidiosis.... However, what Ms. Welling may not be aware of are the various studies that have been conducted comparing IMMUNO–C ™ to the hyperimmune product employed by ImmuCell. These studies, carried out in what we consider to be a predictive animal model, show that ImmuCell's product has very limited effectiveness in comparison to that of IMMUNO–C ™.

Ms. Welling correctly points out that in Biomune's audit report it has a "going concern opinion." However, Barron's fails to reveal that many biotechnology companies, regardless of their cash positions, have such opinions on their financials until such time as ongoing revenues exceed the company's research, development and administrative costs. As Barron' points out, Biomune has in excess of $9,000,000 in current assets with virtually no debt. This cash-rich position allows Biomune to move forward quickly into clinical trials." '

"Further, the Barron's article did not fully explain the facts concerning Biomune's founder Jack Solomon. In 1968, Mr. Solomon founded a company known as APT that later changed its name to United Gaming, Inc. The company was taken public at a price of $10 per share. .Mr. Solomon left United Gaming in 1980 at which time its stock was selling for $8.50 per share. Barron's gives the impression that United Gaming subsequently went under. This is far from the truth. Currently, United Gaming has revenues in excess of $100,000,000 and is listed on NASDAQ's National Market System. Between 1975 and 1980, Mr. Solomon raised money though a series of private placements involving more than 35 non-accredited investors. The SEC claimed that United Gaming had circumvented registration rules by selling unregistered securities in non-exempt transactions. As president and chairman of United Gaming, Mr. Solomon consented to never violate these SEC regulations again in the future."
Letter from Derrick to shareholders (Aug. 4, 1994).

issued by Biomune on that date notified shareholders that these "independent laboratory tests" demonstrated the effectiveness of Biomune's drug, Immuno–C, "against the parasite cryptosporidiosis in animals as well as humans." [25]

10. Plaintiff made no attempt prior to October 12, 1994, and waited until sometime in January 1995, to investigate the accuracy of Biomune's September 21 press release concerning the effectiveness of Immuno–C.

11. During the time period in question, August 1, 1994 to October 12, 1994, Sterlin made no effort to contact Dr. Upton, Dr. Healey, Dr. Yang, Dr. Barker, Dr. Garvey or any other doctor, person or organization involved in or familiar with the testing of Immuno–C. [26]

12. Dr. Upton could have revealed and had knowledge sufficient to reveal to investors whether or not Biomune had misrepresented his test results, but plaintiff made no attempt to contact him prior to October 12, 1994. [27] Dr. Upton was never instructed by Biomune or any other person or organization not to discuss the Immuno–C clinical trials. [28]

13. Dr. Barker averred that he was willing and able to disseminate information concerning the clinical trials performed with Immuno–C including the results of the Upton and Healey studies. Plaintiff averred in an affidavit that he tried to call Dr. Barker in January 1995, and that as a result of the conversation, plaintiff believed he would not be permitted to talk with Dr. Barker then or at any time prior. [29] However, the court grants defen-

25. On September 21, 1994, Biomune issued a press release which was read by plaintiff and which stated in part:

Biomune Systems, Inc. (NASDAQ: "BIME") today announced the result from independent laboratory tests utilizing a recently developed in vitro test that demonstrated the effectiveness of Biomune's drug, IMMUNO–C ™, against the parasite cryptosporidiosis in animals *and humans.* Although preliminary, the results indicated that between the second and fifth day IMMUNO–C ™ inhibited the developmental stages of the parasite, thus causing eradications of this highly infectious disease.
The in vitro assay that was used to evaluate IMMUNO–C ™ was developed by Dr. Mark Healey and Dr. Shiguang Yang at Utah State University.
According to Dr. Healey, Biomune's drug, IMMUNO–C ™ is the first passive immunity product tested by this new assay that has shown significant activity against the parasite.

26. In fact, Sterlin did nothing more in any way to investigate the charges in the *Barron's* article until January 1995, after the stock fell following the release of the 10–K SEC filing for the year ending September 1994, which included negative results of the in vivo Healey study.

27. Plaintiff claims that he reasonably assumed that Dr. Upton had a confidentiality agreement with Biomune and therefore Dr. Upton would not have talked to an investor about the results of his study. Plaintiff

averred that he discovered Dr. Healey had a confidentiality agreement with Biomune, and he assumed that Dr. Upton also had such an agreement. However, that information was learned by plaintiff from his attorney long after October 12, 1994, sometime in 1995. No evidence of a confidentiality agreement between Dr. Upton and Biomune was presented to the court.

28. Upton Decl. ¶ 3.

29. In an affidavit filed after his deposition was taken plaintiff avers that in January 1995, he attempted to reach Dr. Barker by telephone call to Biomune, but that he had the impression that he wouldn't be allowed to speak with Dr. Barker in January or at any other time. He talked with Joy Erickson, who he had contacted on previous occasions and knew her to be the contact person for shareholder inquiries. Ms. Erickson referred him to Dr. Frank Eldredge who was available and who took his call. Plaintiff proffers this evidence apparently to show that a reasonable investor would have thought it to be futile to attempt to converse with Dr. Barker prior to October 12, 1994. Plaintiff made no attempt to contact Dr. Barker during the relevant time period through the Biomune offices or at the Salt Lake Clinic or the University of Utah College of Medicine, where stockholders were told he worked. Plaintiff does not claim that he made any attempt to contact Dr. Garvey, who also was a director of Biomune and served with Dr. Barker on the company's scientific board of advisors.

dants' motion to strike statements to that effect from the affidavit because such are inconsistent with his deposition testimony.[30]

14. Dr. Healey averred that although he had a confidentiality agreement with Biomune, he would have answered questions from stockholders about his tests and study.[31]

15. SEC reports referred to in the *Barrons* article, including particularly Biomune's Form 10–K for the year 1993, provided the following public information available to investors:

30. "Q. Do you remember when that conversation [with Biomune's employee Joy Erickson] took place?
A. I cannot say the exact date, but that was, that was either late January '95 or February '95.
Q. How did you get Frank Eldridge's phone number?
A. I called Biomune and at the time was—what is her name?
Q. Can I try to help, Joy Erickson?
A. That's right, I spoke to her. I spoke to her, which is where we came to some I think rather scientific thing to discuss, and she didn't have an answer for that so she switched me to Mr. Eldridge, that was the first time."
Sterlin Depo., pp. 64:13–65:6 (Supp. Park Decl., Ex. A). There was no mention of Dr. Barker in the conversation.

31. Plaintiff made no attempt prior to October 12, 1994, to contact Dr. Healey or anyone about Dr. Healey's tests. No evidence was submitted that Biomune would have directed or requested Dr. Healey not to respond to stockholder questions prior to that date or thereafter. Plaintiff had no knowledge prior to that date that Dr. Healey had entered into a confidentiality agreement with Biomune.

32. "During fiscal year 1991, $36,000 of amounts owed to Mr. Solomon were converted to 36,000 shares of common stock." *Report of Independent Public Accountants* from Arthur Andersen & Co. to Biomune Systems, Inc. at F–2 (December 15, 1993), available in Biomune Systems, Inc., Annual Report for the fiscal year ended September 30, 1993 and the two month period ended November 30, 1993, on SEC Form 10–K at 22 (January 14, 1994).
The Arthur Andersen report filed with the SEC also informed the public that fees owed by Biomune to Genesis for consulting services rendered by Solomon were converted into stock. *See* Fn. 35, *infra*.

a. Jack Solomon, the founder of Biomune, in fact was a shareholder of the company.[32] This is contrary to Biomune's statement filed with the SEC.[33]

b. Mr. Solomon provided substantial consulting service to Biomune directly and through a family corporation known as Genesis Investment Corporation.[34] Solomon's consulting fees in large part were converted to stock.[35]

c. Mr. Solomon was in a position to control Biomune indirectly through Genesis.[36]

33. Biomune's 1993 SEC Form 10–K sets forth at page 28 that "[t]he Company is further advised that Mr. Solomon does not have any direct or indirect ownership interest in the Company."

34. The Arthur Andersen Report at F–24 states: "In 1987, the Company entered into a consulting agreement with Mr. Jack Solomon, a founder and *shareholder* of the Company. The agreement was terminated on June 30, 1991; however, Mr. Solomon continues to consult with the Company under the Genesis consulting agreement described below. During fiscal year 1991, the Company recorded consulting fees of $9,000, payable to Mr. Solomon." (Emphasis added.)

Biomune's 1993 SEC Form 10–K at 29 further states:
In August 1991, the Company entered into a Consulting agreement with Genesis whereby Genesis would receive $10,000 per month plus reimbursement of any out-of-pocket expenses for financial consulting services. Prior to this agreement, the Company had employed Jack Solomon. When Mr. Solomon became employed by Genesis, Mr. Solomon's contract was canceled and a new consulting contract was entered into with Genesis.

35. "[I]n fiscal years 1991, 1992, and 1993, $50,770, $83,120 and $129,457, respectively, of amounts owed to Genesis were converted to 50,770, 83,120 and 129,457 shares of common stock." Arthur Andersen Report at F–24.

36. Biomune's 1993 SEC Form 10–K at 30 reveals that Genesis owns 30.77% of Biomune, and states: "[T]he shareholder of Genesis Investment Corporation is the Genesis Trust, the beneficiaries of which are members of the Jack Solomon family."

d. Indebtedness incurred by Biomune was retired in large part because of a settlement agreement with the Solomon family's Genesis Investment Corporation, which resulted in transfer of Biomune property to Genesis. This also enabled Genesis to exercise warrants for Biomune stock at an exercise price of $3 per share.[37]

e. The balance sheet and cash position of Biomune was greatly enhanced for purposes of NASDAQ listing as a result of sales of stock in private placements.[38]

f. The asset side of Biomune's balance sheet was substantially enhanced by acquisition of technologies from Bryan Furtek in exchange for a promissory note.[39]

g. Ladenburg Thalmann & Co., an investment bank which publicly recommended the purchase of Biomune stock, was paid in Biomune shares for the services it rendered to Biomune.[40]

16. Plaintiff relied on publicly available documents in making the allegations of fraud in the original complaint as to Immuno–C.[41]

17. Manipulation of Biomune stock, control of Biomune by Solomon, the settlement with Genesis, public offerings via the sale of private placements of stock, and the Furtek technologies acquisition were alleged by plaintiff to be fraudulent in his original complaint filed October 12, 1995. The underlying facts concerning those transactions were set forth in public documents identified in the Welling article, and other publicly available SEC documents

---

**37.** The Settlement Agreement between Genesis and Biomune is attached to 1993 SEC Form 10–K as Exhibit 10.33.

Biomune's 1994 SEC Form 10–QSB at 10 states: "Effective October 1, 1993, the Company agreed to transfer certain assets to Genesis as payment on the note payable owed to Genesis. The note payable had a principal balance of $1,010,226 and accrued interest of $59,420 (net of rental income due from Genesis of $31,500). The Company transferred real estate with a fair market value (and book value) of $1,150,000 and Genesis assumed two notes payable secured by the real estate with principal balance totaling $440,139. The remaining $359,785 owed to Genesis under the note was converted to 119,928 shares of common stock by Genesis exercising warrants with an exercise price of $3 per share."

**38.** Biomune's 1993 SEC Form 10–K at 19 states: "During the fiscal year ended September 30, 1993, the Company sold subscriptions for the purchase of 323,000 shares of Series A 10% Cumulative Convertible Preferred Stock for $1,615,000 of which $475,000 of cash was received as of September 30, 1993. During the two month period ended November 30, 1993, the Company sold additional subscriptions for the purchase of 677,000 shares of Series A 10% Cumulative Convertible Stock for $3,385,000. As of November 30, 1993, the Company had collected $1,800,000 of the total $5,000,000 in subscriptions."

\* \* \* \* \* \*

As of March 31, 1994, the Company had sold 1,000,000 shares of Series A convertible preferred stock for $5,000,000. 1994 SEC Form 10–QSB at 110.

**39.** The Purchase Agreement between Furtek and Biomune is attached to the 1993 SEC Form 10–K as Exhibit 10.34.

Biomune Systems, Inc., Quarterly Report for the quarterly period ended March 31, 1994 on SEC Form 10–QSB at 9: "On November 30, 1993, the company purchased from Bryan Furtek the proprietary rights, trade secrets and interests in certain technologies.... The company exchanged its note receivable from a university ... which had an asset value of $1,129,383 (the remaining value of the note of $1,021,987 was in contra equity) for the rights to these three technologies."

**40.** A letter from John C. Moore III, Managing Director of Ladenburg, Thalmann & Co. Inc., to David G. Derrick, President of Biomune, included in the SEC filing states:

In consideration of the performance by Ladenburg of such services, and in lieu of Ladenburg's normal annual retainer, the Company will issue to Ladenburg or its designees, warrants, in the form annexed as Exhibit A to this agreement, expiring September 30, 1998 and entitling Ladenburg or its designees to purchase 200,000 shares at a purchase price of $5.00 per share.

Letter from Moore to Derrick (September 12, 1993) in 1993 SEC10–K, Ex. 10.28.

**41.** *See* Plaintiff Roman Sterlin's Verified Supplemental Responses to Biomune's First Set of Interrogatories (Park Decl. Ex. W.) Plaintiff also responded that he relied upon unspecified telephone calls and letters.

set forth in the next paragraph all of which were filed prior to October 12, 1994.

18. Additional SEC documents were publicly available during the period March 17, 1993 to October 12, 1994. The court takes judicial notice of the contents of those SEC documents which were lodged with the court as exhibits.[42] These additional SEC documents provide further information concerning the transactions plaintiff claims to be fraudulent.

### Analysis

This court concludes that the one year statute of limitations applicable to both the Immuno–C and the NASDAQ claims began to run sometime before October 12, 1994. It is manifest that the facts underlying both claims were readily available to the general public on and after August 1, 1994, when Biomune investors were placed on inquiry notice. If a reasonably prudent and diligent investor had reviewed the readily available public SEC and other documents referred to in the *Barron's* article, and made reasonable inquiries such as contacting persons known to have information concerning the studies by Dr. Upton, she would have discovered not only the factual basis for the statements made by Ms. Welling which constitute inquiry notice, but she also would have discovered additional documents [43] and matters revealing the underlying facts concerning the alleged frauds at least one year before the

original complaint was filed on October 12, 1995.

In the case at bar, plaintiff failed to exercise the diligence required of a reasonably prudent and diligent investor triggered by inquiry notice. Although plaintiff contacted Ms. Welling, the author of the *Barron's* article, as well as Mr. Solomon, a representative of Biomune, such contacts alone were not enough to discharge his duty. A reasonably diligent investor upon reading the *Barron's* article immediately would have checked out the sources provided by Ms. Welling, including Form 10–K for the year 1993 filed by Biomune with the SEC, the Arthur Andersen audit report contained in the 1993 SEC report, the 1994 first quarterly SEC Form 10–QSB, and the Nevada Court records and injunction against Solomon. In addition, a reasonable investor would have contacted the independent doctors involved in the clinical studies of Immuno–C, particularly Dr. Upton, whose studies plaintiff had reason to believe were misrepresented by Biomune, as plaintiff alleged in his original complaint. A reasonable investor would have scrutinized the transactions described in SEC documents referred to by Ms. Welling, which transactions had eliminated Biomune's debt and enabled public trading on the NASDAQ. Plaintiff did not do any of these things or even attempt to do so until much later than October 12, 1994.

---

**42.** Exhibits B through M were submitted by defendants in support of Motion for Summary Judgment as to the NASDAQ claim, as follows:

Exhibit B—Form 10–KSB, for the fiscal year ended September 30, 1993 and filed January 14, 1994

Exhibit C—Form 8–K, dated March 10, 1993 and filed March 17, 1993

Exhibit D—Form 10–Q for the Quarter ended March 31, 1993 and filed May 17, 1993

Exhibit E—Form 10–Q for the quarter ended June 30, 1993 and filed August 16, 1993

Exhibit F—Form 10–Q for the quarter ended December 31, 1993 and filed February 17, 1994

Exhibit G—Form 10–QSB for the quarter ended March 31, 1994 and filed May 16, 1994

Exhibit H—Form 8–K dated April 5, 1994 and filed April 6, 1994

Exhibit I—Form 8–KSB dated May 18, 1994 and filed May 19, 1994

Exhibit J—Form 8–KSB dated June 7, 1994, and filed June 14, 1994

Exhibit K—Form 8–KSB dated June 15, 1994 and filed June 27, 1994

Exhibit L—Form 8–K dated July 12, 1994 and filed July 13, 1994

Exhibit M—Form 10–QSB for the quarter ended June 30, 1994 and filed August 15, 1994

**43.** *See* Fn. 42, *supra.*

If plaintiff relied on contacts with Mr. Solomon of Biomune and written assurances to shareholders by Biomune C.E.O. Derrick, such reliance was badly misplaced. As the Tenth Circuit said, "[o]nce the storm clouds had gathered, the 'dear shareholder' letters ... refuting the claims in the article could not dissipate them." *Sterlin*, 154 F.3d at 1204. A reasonably diligent investor would have been wary of assurances made by Biomune, particularly after the article was published, and should have become even more suspicious when the very man Welling warned about-Jack Solomon-assured him that Immuno-C was efficacious and suggested to plaintiff that he should buy more stock. Instead of becoming motivated to further investigate, however, plaintiff took Solomon's suggestion and bought more stock. Perhaps motivated by greed, or something more than curiosity, plaintiff apparently chose to wait and see whether Jack Solomon's prediction of a rise in stock price would come to pass. It appears to the court that plaintiff's conduct and lack of due diligence was the result of willful blindness. Willful blindness does not toll the limitations period. An investor is not permitted to delay diligent pursuit of facts underlying a claim in the expectation that a lawsuit may be filed later, when it is determined to be advantageous if the investment proves to be unprofitable. *See Anixter v. Home–Stake Prod. Co.* [Anixter IV], 977 F.2d 1549, 1552 (10th Cir.1992) ("The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act.") (quoting *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1413 (9th Cir.1987))

Rather than the exercise of due diligence, plaintiff adopted a "wait and see" strategy concerning possible fraud as to Immuno–C, as well as stock manipulations and trading in the "NASDAQ's smallcap arena," as it was characterized by Ms. Welling.

**Immuno–C Claim:**

■ The crux of the Immuno–C claim is that Biomune misrepresented the efficacy of the drug Immuno–C in order to inflate Biomune stock for the financial benefit of defendants. Plaintiff alleged in his original complaint that announcements and letters by Biomune and those in concert with Biomune describing the effectiveness of Immuno–C and specifically the results of Dr. Upton's study were false or misleading.[44] If the results indeed were misrepresented, a reasonably prudent investor, in the exercise of diligence, could have and should have discovered the facts underlying that claim within the period following inquiry notice on August 1, 1994 until October 12, 1994, one year prior to filing the original complaint.[45] But plaintiff failed to meet the "obligation of diligence" imposed upon a prudent investor. Certainly a reasonably prudent and diligent investor could and should have contacted Dr. Upton, who is a reputable researcher and professor, and asked him whether the statements issued by Biomune correctly set forth or misrepresented the results of his study. There is nothing in the record to suggest that, if so contacted, Dr. Upton would have refused to provide plaintiff with the necessary information. A simple inquiry to Dr. Upton likely would have led to the discovery of facts underlying the Immuno–C claim. Plaintiff failed to even attempt such an inquiry. If upon diligent attempts to speak to Dr. Upton his re-

---

44. See complaint ¶ 40 et seq. In *Sterlin v. Biomune Systems*, the Tenth Circuit aptly describes the alleged Immuno–C misrepresentations. 154 F.3d at 1193, 1194.

45. It should be noted that this court's holding that a reasonably prudent and diligent investor could have and should have discovered

the facts underlying the alleged fraud within the time period in question does not constitute a finding that the alleged conduct was fraudulent or that it did not constitute fraud. Rather, the court's holding is driven by the inquiry whether the facts underlying the claims alleged were discoverable within the relevant time frame.

sponse was ambiguous, or not forthcoming, or if Dr. Upton was unavailable or unwilling to comment at all for any reason, a reasonably diligent investor would then have had even more reason to be suspicious and should have taken further immediate steps to exercise diligent inquiry-by contacting others who he had reason to believe had knowledge of the facts, such as Dr. Barker, Dr. Garvey, Dr. Yang and Dr. Healey.

Plaintiff argues that misrepresentation of the Upton study was only the initial fraud concerning Immuno–C, emphasizing alleged concealment of the subsequent Healey study. However, the results of the Healey study and its alleged concealment would have been only a make-weight circumstance bearing upon the same fundamental grievance, i.e., alleged fraud as to the efficacy of Immuno–C. That was and is the gravamen of the Immuno–C claim-whether by way of affirmative misrepresentation of the Upton study, or by fraudulent concealment of the Healey study,[46] or otherwise. While the results of the study by Dr. Healey may have supported plaintiff's claim of fraud as to Immuno–C, they were not necessary to it. In any event, plaintiff did nothing prior to October 12, 1994, or indeed for months thereafter, by way of attempted contact with Dr. Healey or others after he became aware of Dr. Healey's study in September 1994.

■ Plaintiff also argues that the statute did not begin to run until the negative results of the in vivo Healey study became nationally available through S.E.C. Form 10–K for 1994 filed by Biomune with the SEC on January 13, 1995, because plaintiff sustained no damages until the stock value fell following that SEC filing. However, a

drop in stock prices is not necessary to prove damages in a securities fraud action. To the contrary, inflation in the price of the stock due to acts of fraud constitutes sufficient evidence of damages. *See Estate Counseling Svc., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 303 F.2d 527, 533 (10th Cir.1962).

Based upon the foregoing, this court holds that a reasonably prudent and diligent investor should have discovered the facts underlying the alleged fraud before October 12, 1994. Because plaintiff failed to meet the standard of prudence and diligence required, the motion of defendants for summary judgment regarding Immuno–C should be granted. Plaintiff's § 10(b) claims were not timely filed and are barred by the statute of limitations.

**NASDAQ CLAIM:**

Plaintiff also alleged fraud in his original complaint concerning Biomune's stock manipulations arising from its listing on the Nasdaq Small Cap Market Systems.[47] This resulted in artificial inflation of the price of Biomune's stock made possible by allegedly fraudulent transactions, such as the settlement arrangement with Genesis Investment Corp., the Furtek Technologies transaction, and the sale of stock in private placements. These three transactions are set forth in detail in SEC filings which were readily available prior to October 12, 1994.[48] While these transactions are spelled out in more detail in the amended complaint filed in 1996, such should have been and could have been discovered by the exercise of reasonable diligence more than 1 year before the original complaint was filed. The existence of suspicious stock price manipulations on the

---

**46.** Adopting the test based on "hypothetical diligence," the Tenth Circuit in *Peterson, Lowry, Rall, Barber, and Ross* said: "... we see no reason why an act of concealment by defendant should excuse plaintiff from his obligation of diligence, which he owes the court as well as his adversaries." 651 F.2d at 694.

**47.** See allegations concerning "Motive to Defraud" and other related allegations in com-

plaint filed October 12, 1995, ¶24 et seq. The Nasdaq listing claim is described in the Tenth Circuit *Sterlin* opinion at 154 F.3d at 1191–1192.

**48.** See particularly Fns. 34–37, *supra* (Genesis); Fns. 12–14, 38, *supra* (private stock sales); Fn. 39, *supra* (Furtek transaction); Fns. 8–17, *supra* (stock manipulation).

NASDAQ were set forth in the Welling article, and the reader was referred to readily available public documents which she identified.[49] These transactions are further described in detail in SEC documents which were filed between March and August 1994, which were readily and publicly available.[50] Simply checking those documents would have revealed direct stock ownership and indirect control of Biomune by Solomon.[51]

It is alleged in the amended complaint filed in 1996, that defendants had to overcome two obstacles in order to obtain the NASDAQ listing. First, that because of the Nevada injunction against Jack Solomon, Biomune needed to show that Solomon was not in control of the company. Second, Biomune needed to eliminate its $9 million debt. Plaintiff alleges that Biomune disguised Solomon's control of the company, and that in order to obtain the listing, it eliminated its debt by engaging in three fraudulent transactions: an illegal regulation S offering (i.e. the private placements), the purchase of Furtek technologies, and the settlement with Genesis.[52] All of these matters are set forth in the SEC filings. All could have been discovered and fleshed out upon reading and following leads from the SEC documents which were publicly available prior to October 12, 1994. It is manifest that the essence of what is alleged in the amended complaint in the so-called NASDAQ listing claim is contained in the original complaint or public documents which were available before the original complaint was filed. The factual basis concerning Solomon's direct and indirect control of Biomune, including through Genesis, the Genesis settlement which eliminated debt, private placements of stock whereby necessary liquidity was achieved, the questionable Furtek technologies transaction and manipulation of Biomune stock on the NASDAQ were all discoverable by a reasonably

diligent investor. A reasonably diligent investor should have examined those filings and by doing so could have discovered the facts underlying those transactions and the alleged NASDAQ fraud.

Plaintiff argues that a reasonable investor could not have discovered the facts underlying this fraud within the time period in question because the fraudulent nature of the transactions was more fully explained and detailed with the help of an unnamed informant who supplied information sometime in 1996, well after plaintiff filed his original complaint on October 12, 1995. This court considers that such late discovered private information should not be a part of this analysis. The information provided by the informant may have bolstered the claims of fraud already asserted by plaintiff, but this proposed privately transmitted evidence is not probative as to whether a prudent and reasonably diligent investor should have discovered the underlying facts prior to October 12, 1994. Manifestly, the underlying facts were discoverable prior to that date.

Plaintiff seeks to assert a subjective test which would require actual notice of the NASDAQ-related claims in order to commence the running of the statute of limitations.[53] There may be some support for this position in other jurisdictions, but that is not the test adopted by the Tenth Circuit court—and it is rejected by this court. In this regard, defendants have moved to strike portions of the David J. Goldsmith Declaration attached to plaintiff's Memorandum in Opposition, which incorporates hearsay evidence given to plaintiff in 1996 by the confidential informant. That motion is meritorious and it is granted.

■ Plaintiff further argues that there was no way to know that the transactions were fraudulent and particularly to determine the intent of those involved until the

---

**49.** See Fns. 8–14, 36–39, *supra.*

**50.** See Fn. 42, *supra.*

**51.** See Fns. 32–35, *supra.*

**52.** See *Sterlin,* 154 F.3d at 1191, 1192.

**53.** See Plaintiff's Memorandum in Opposition in re NASDAQ listing claims, at 10–11.

informant explained the true nature of the transactions. However, in the *Peterson* case, the Tenth Circuit made it clear that it is not necessary that every element of a claim be provable for the statute of limitations to begin to run, and that a plaintiff's inability to prove scienter will not postpone the running of the statute. The court said:

> Although scienter is a necessary element of a § 10(b) private action, ... in many cases scienter will emerge only as an inference from the facts before the jury. This circumstance cannot be used as a basis for emasculating the statute of limitations. Discovery for equitable tolling purposes must not, therefore, be equated with each and every element of plaintiff's case.

*Ohio v. Peterson, et al.,* 651 F.2d 687, 695 (10th Cir.1981) (citations omitted).

This court rules that a reasonably prudent and diligent investor could have and should have followed the leads and heeded the warnings which triggered inquiry notice, available from publicly available information, and thus discovered the facts underlying the alleged NASDAQ frauds before October 12, 1994. Plaintiff failed to meet the standard of prudence and diligence required. Accordingly, defendants' Motion for Summary Judgment as to the NASDAQ claim should be granted because plaintiff's § 10(b) claims were not timely filed and are barred by the statute of limitations.

Based upon the foregoing, it is hereby

**ORDERED,** that defendants' Motion for Summary Judgment regarding plaintiff's Immuno-C claim is **GRANTED** as to all defendants; it is

**FURTHER ORDERED,** that defendants' alternative Motion for Summary Judgement regarding plaintiff's NASDAQ claim contained in plaintiff's Amended Complaint is **GRANTED** as to all defendants.

Counsel for defendants are directed jointly to prepare a form of Judgment consistent with this Order and lodge it with the court within 30 days, after first complying with local Rule 54–1(b).