**Robert GREENBURG, etc., et al., Plaintiff,**

v.

**Glen HINER, et al., Defendant.**

**No. 3:03 CV 7036.**

United States District Court, N.D. Ohio, Western Division.

March 3, 2005.

Ira M. Press, Jeffrey H. Squire, Kirby, McInerney & Squire, Lawrence P. Eagel, Bragar, Wexler, Eagel & Morgenstern, New York, NY, Timothy J. Fitzgerald, Gallagher, Sharp, Fulton & Norman, Cleveland, OH, John J. McHugh, III, McHugh, Denune & McCarthy, Sylvania, OH, Andrew Zivitz, Schiffrin & Barroway, Bala Cynwyd, PA, James P. Silk, Jr., Spengler Nathanson, Toledo, OH, for Plaintiffs.

Chad W. Pekron, John M George, Jr, Walter C. Carlson, Sidley, Austin, Brown & Wood, Chicago, IL, Janine T. Avila, Steven R. Smith, William M. Connelly, Connelly, Jackson & Collier, Toledo, OH, David W. Zoll, Zoll & Kranz, Toledo, OH, for Defendants.

Christopher Lometti, Frank Rocco Schirripa, Joel P. Laitman, Samuel P. Sporn, Schoengold & Sporn, Jay P. Saltzman, Schoengold & Sporn, New York, NY, for Intervenor.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Doc. No. 44). Plaintiffs have filed a Response (Doc. No. 55); Defendants have filed a Reply (Doc. No. 59). Also before the Court is Plaintiffs' Motion to Modify the PSLRA Discovery Stay (Doc. No. 67), to which Defendants have filed a response (Doc. No. 69). The Court has jurisdiction under 15 U.S.C. § 78aa and 28 U.S.C. § 1331. Because Plaintiffs' claims are time-barred, Defendants' motion to dismiss is granted. Plaintiffs' motion to modify the discovery stay is denied as moot.

### BACKGROUND

The Plaintiffs in this action are a class of all investors who purchased Owens Corning Inc. ("Owens Corning" or "OC") securities between September 20, 1999 and October 5, 2000, inclusive (the "Class Period"). Defendants are six current or former officers and/or directors of Owens Corning, which is now in Chapter 11 bankruptcy protection and is not a defendant in this action. Specifically, as the Plaintiffs allege: Glen Hiner ("Hiner") was OC's Chief Executive Officer and Chairman of the Board of Directors during the Class Period; Michael Thaman was Senior Vice President and Chief Financial Officer ("CFO") from April 10, 2000 through the end of the Class Period and, before that, was President and Vice President of Owens Corning's Exterior Systems Business; J. Thurston Roach was OC's CFO from the beginning of the Class Period until April 10, 2000; Deyonne F. Epperson was the Senior Vice President of Corporate Audit during the Class Period and was OC's Comptroller from January 5, 2000 through the end of the Class Period; Landon Hilliard was a Director of Owens Corning and served on its Compensation Committee during the Class Period; and Maura Abeln Smith ("Smith") was OC's Senior Vice President and Secretary during the Class Period, is its current Chief Restructuring Officer, and is now a Director.

Owens Corning is a manufacturer of building materials and a past manufactur-

er of asbestos products. Hundreds of thousands of claimants sued OC in the 1980s and 1990s over asbestos-related injuries. In 1997, Owens Corning purchased Fiberboard Corporation ("Fibreboard"), which also had extensive asbestos-related liabilities.

In 1998, apparently in an effort to resolve asbestos claims against both OC and Fiberboard in a more manageable, inexpensive, and predictable manner by avoiding litigation, Owens Corning created an asbestos claims processing program called the National Settlement Program ("NSP"). As described in Plaintiffs' Complaint, under the NSP, OC entered into agreements (the "NSP agreements") with law firms representing large numbers of asbestos claimants. The NSP agreements set fixed settlement amounts, based on disease type and severity, to be offered to the firms' clients with asbestos claims against OC or Fibreboard. The claimants submitted evidence of a qualifying medical condition and exposure to an OC or Fibreboard asbestos product, and OC processed each claim and scheduled a settlement payment. At some point, Fibreboard had settled with two of its insurers for $1.87 billion, and OC placed that amount into the "Fibreboard Trust" to pay Fibreboard's NSP settlements. Owens Corning payed its own settlement agreements from its litigation reserves.

Plaintiffs' complaint alleges that from 1998 to October, 2000, "purportedly 200 people worked to settle approximately 240,000 claims through the NSP," and that approximately 5,000 of those settlements took place during the Class Period. Plaintiffs have denominated the 235,000 OC settlement agreements and the additional 200,000 Fibreboard settlement agreements existing at the outset of the Class Period as the "Initial Settlements."

On May 12, 2000, Defendant Smith met with representatives of the NSP law firms and disclosed to them that the payments OC was, as of December, 1999, scheduled to pay out over the next eighteen months, i.e. payments on the "Initial Settlements," exceeded the company's ability to pay by $500 million, and that the Fibreboard trust would run out of money in 2004, apparently earlier than anticipated. Smith told the NSP lawyers that the NSP was "oversubscribed" and the "disease mix" was more serious than the company had anticipated. Smith asked the NSP lawyers to agree to defer OC's and Fibreboard's obligations to the extent necessary to ensure that the company paid no more than it had previously estimated it would pay out on the already settled claims. After a period of negotiations, the NSP lawyers agreed to a deferral of payments for OC's (but not Fibreboard's) settlements.

The request for a deferral of OC's scheduled payments was disclosed to the public through media releases on April 13 and 14, 2000 and in the company's Form 10–Q for the quarter ending March 31, 2000, filed on May 8, 2000, which stated: "Owens Corning has requested that NSP participating firms agree to defer payments in 2000 through 2002 on present cases to the extent necessary to ensure that Owens Corning limits its total asbestos payments to the ... [stated] schedule." (Doc. No. 43, Amd. Cons.Class Action Compl., ¶ 134 (quoting March 31, 2000 Form 10–Q)). On June 26, 2000, OC issued a press release divulging that it had "reached agreements in principle" which might result in deferring $500 million in NSP payments. Id. at ¶ 141 (quoting June 26, 2000 press release). On August 14, 2000, OC reported in its Form 10–Q/A for the quarter ended June 30, 2000 that an executive committee appointed by the NSP law firms had recommended that the firms accept the OC deferral program. The 10–Q/A reported that "[t]he Deferral Program

is designed to facilitate continued predictability and manageability of Owens Corning's cash flow." *Id.* at ¶ 151 (quoting Aug. 18, 2000 Form 10–Q/A).

Additionally, and importantly, the 10–Q/A filed August 14, 2000 stated that settlements beyond the Initial Settlements, i.e., claims filed after June 1, 1999, or the "Future Claims," would not be paid until 2003. With this statement, OC essentially related that, in the words used by Plaintiffs in their complaint, "the Company's cash flow would not be affected by NSP settlements beyond the Initial Settlements until 2003." (Doc. No. 43, Amd. Cons. Class Action Compl., ¶ 159).

In addition to the deferral requests, OC also disclosed, in a July 13, 2000 press release and in the 10–Q/A filed August 14, 2000, that, after reviewing the sufficiency of its asbestos reserve, "in light of recent trends and developments in the administration of the NSP and in asbestos litigation generally," it took a pre-tax charge of $1 billion ($1,000,000,000) to increase its asbestos reserve in the second quarter of 2000. (Doc. No. 43, Amd. Cons.Class Action Compl., ¶ 150 (quoting August 14, 2000 Form 10–Q/A)).

Despite these tactics, on October 5, 2000, the last day of the Class Period, OC filed for bankruptcy, explaining in a press release that despite OC's business successes:

> [T]he increasing asbestos liabilities and difficulty of estimating its future asbestos liabilities, especially the cost of settling current and future mesothelioma claims, required the company to consider a range of strategic and financial alternatives. . . .

(Doc. No. 43, Amd. Class Action Compl., ¶ 157 (quoting Oct. 5 press release)). The Press release quoted Defendant Hiner as saying that "the cost of resolving current and future claims, together with a flurry of recent new filings from plaintiff lawyers not participating in the NSP, led us to the conclusion that a Chapter 11 reorganization was prudent and necessary." *Id.*

After the bankruptcy, in its Form 10–Q for the quarter ended September 30, 2000, filed on November 14, 2000, the company divulged for the first time the March 12, 2000 request that the NSP lawyers defer payments on Fibreboard settlements, and the lawyers' subsequent rejection of that request.

A member of the class initiated this lawsuit on January 27, 2003, claiming Defendants and Owens Corning made false and misleading statements in violation of Section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act") and Rule 10b–5. Plaintiffs also alleged Defendants were liable under Section 20(a) of the 1934 Act as controlling persons of Owens Corning. After several consolidations and the appointment of lead counsel, Plaintiffs filed their Amended Consolidated Class Action Complaint (Doc. No. 43) on September 9, 2003. In it, Plaintiffs set out numerous claimed "Materially False and Misleading Statements Made During the Class Period." The Complaint treats the defendants as a group for pleading purposes, and presumes "that the false or misleading information conveyed in the Company's public statements in press releases . . . is the collective action of this narrowly defined group of individuals, who were the controlling and highest ranking executives at Owens Corning." (Doc. No. 43, Amd. Class Action Compl., ¶ 24). Because it decides Defendants' motion on statute of limitations grounds, the Court makes no comment on Plaintiffs' use of "group pleading" or Defendants' challenge to this practice.

Plaintiffs allege that during the Class Period, Defendants made false and misleading statements in speeches, interviews,

press releases, conference calls with analysts and news media, and in OC's financial statements. Plaintiffs' allegations are set out in full at paragraphs 83–155 of the Amended Consolidated Class Action Complaint (Doc. No. 43). Essentially, Plaintiffs complain that Defendants' representations concerning OC's financial state in general and their affirmative representations regarding the company's asbestos liability and the NSP in particular were fraudulent because they omitted material information necessary to make the statements not false and misleading. Boiled down, the allegedly fraudulent affirmative representations regarding OC's asbestos liability and the NSP amount to statements that: settlement and payment of claims under the NSP were "on track"; the NSP was working and was increasing the predictability of asbestos liabilities and cash flow and was increasing OC's ability to quantify the cost of resolving nearly all pending asbestos claims; average payments under the NSP were expected to be lower than average pre-NSP payouts; the Initial Settlements would be paid off by the end of 2000 and the company's reserve was more than adequate to cover them; total payouts in 2000 through 2003 would be at stated amounts and the company could afford its asbestos liability; the Fiberboard trust was adequate to fund Fibreboard's asbestos liabilities for the foreseeable future; the deferral program was designed to increase predictability and manageability of the company's cash flow; and, starting on March 14, 2000, OC would begin and continue a review of the adequacy of its liability estimates.

Plaintiffs claim these statements were misleading when made because OC and the Defendants did not disclose the facts that: the NSP was oversubscribed and the company did not have the ability to pay the Initial Settlements; scheduled payments exceeded the company's funds by at least $500 million; the company's NSP obligations for 2000, 2001, and 2002 were materially more than were disclosed; the obligation to pay the Initial Settlements threatened the company's financial stability; OC's obligations to Fibreboard claimants exceeded the $1.87 billion in the Fibreboard trust, which was expected to run out of money in 2004; the company was not paying the Initial Settlements promptly and would not be able to pay them off by 2000; the average NSP claim was actually increasing from pre-NSP levels; known NSP obligations were much higher than estimates given to analysts and far exceeded reserve levels and the obligations disclosed in financial statements; without the sought-after deferrals for both OC and Fibreboard, the company's financial viability was in jeopardy; the company knew it had already assessed the adequacy of its liability estimates and reserves and determined them to be inadequate well before it disclosed that it would begin such a review; the deferral program was designed to do nothing short of saving the company from financial ruin; and the NSP lawyers did not agree to a deferral for Fibreboard.

Defendants have moved to dismiss the Amended Consolidated Class Action Complaint, claiming, among other things, that the Plaintiffs' claims are barred by the statute of limitations.

### Discussion

#### A. Motion to Dismiss Standard

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the function of the Court is to test the legal sufficiency of the complaint. In scrutinizing the complaint, the Court is required to accept the allegations stated in the complaint as true, *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984), while viewing the complaint in a light most favorable to

the plaintiffs, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). The Court is without authority to dismiss the claims unless it can be demonstrated beyond a doubt that the plaintiff can prove no set of facts that would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Westlake, supra,* at 858. *See generally* 2 JAMES W. MOORE, MOORE's FEDERAL PRACTICE, § 12.34[1] (3d ed.2004).

### B. Section 10(b) and Rule 10b–5

■ Section 10(b) of the Securities Exchange Act of 1934 prohibits the use or employment, "in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, n connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. "To state a claim under § 10(b) . . . and Rule 10b–5, a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Hoffman v. Comshare, Inc. (In re Comshare Inc.*

*Secs. Litig.),* 183 F.3d 542, 548 (6th Cir. 1999).

The Private Securities Litigation Reform Act ("PSLRA") additionally requires plaintiffs who seek money damages to specify in their complaint "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); *Fidel v. Farley,* 392 F.3d 220, 227 (6th Cir.2004). The PSLRA further requires the complaint to, "with respect to each act or omission alleged to violate . . . [federal securities law], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," i.e., scienter. 15 U.S.C. § 78u–4(b)(2); *Fidel,* 392 F.3d 220, 227.

### C. Statute of Limitations

Prior to the passage of the Sarbanes–Oxley Act ("Sarbanes–Oxley") in 2002, parties asserting violations of Section 10(b) and Rule 10b–5 were required to file suit "within one year after the discovery of the facts constituting the violation . . . ." 15 U.S.C. § 78i(e); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Sarbanes–Oxley extended to two years the statute of limitations for actions filed after July 30, 2002 alleging securities law violations. While this action was filed on January 27, 2003—after Sarbanes–Oxley's effective date—many courts have held that Sarbanes–Oxley does not revive claims already time-barred prior to the effective date of the amendment. *See Aetna Life Ins. Co. v. Enter. Mortgage Acceptance Co. (In re Enter. Mortgage Acceptance Co.),* 391 F.3d 401, 409–11 (2d Cir. 2004); *Newby v. Enron Corp. (In re Enron Corp. Securities, Derivative, and*

*ERISA Litigation)*, No. H—01–3624, 2004 WL 405886, **17–18, 2004 U.S. Dist. LEXIS 8158, at *72 (S.D.Tex. Feb. 25, 2004); *Glaser v. Enzo Biochem, Inc.*, 303 F.Supp.2d 724, 734 (E.D.Va.2003). The Court concludes, *infra*, that the statute of limitations in this case began to run no later than November 14, 2000. Because Plaintiffs' claims therefore would have been time-barred under *Lampf* when Sarbanes–Oxley took effect, the pre-Sarbanes-Oxley one-year statute of limitations applies. Even under the longer limitations period, however, the result here would be the same: Plaintiffs' claims are time-barred.

■ Under the "inquiry notice" standard the Sixth Circuit employs for securities fraud claims, Plaintiffs were under a duty to begin investigating the possibility of fraud when they became aware of suspicious facts, or "storm warnings." *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir.2003). After the duty to investigate arose, the limitations period began to run when Plaintiffs "should have discovered, by exercising reasonable diligence, the facts underlying the alleged fraud." *Id.* If Plaintiffs conducted no inquiry when their awareness of "storm warnings" gave rise to the duty to investigate, knowledge of the fraud "will be imputed as of the date the duty arose." *LC Capital Partners, L.P. v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003); *see also Havenick*, 981 F.Supp. at 514.

■ Because Plaintiffs brought their suit more than one year after the allegedly fraudulent statements were made, they must affirmatively plead circumstances indicating why they did not discover the alleged fraud earlier and why the statute of limitations should be tolled. *Auslender v. Energy Mgmt. Corp.*, 832 F.2d 354, 356 (6th Cir.1987). That is to say, Plaintiffs are not permitted to "[m]erely bring[ ] suit after the scheme has been laid bare through the efforts of others." *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir.1993).

[4] The Sixth Circuit has explained that " '[i]nquiry notice is triggered by evidence of the possibility[1] of fraud, not full exposition of the scam itself.... The plaintiff need only possess a low level of awareness; he need not fully learn of the alleged wrongdoing .... the clock begins to tick when a plaintiff senses "storm warnings," not when he hears thunder and sees lightning.' " *Isaak v. Cortland Savings*, 169 F.3d 390, 399 (6th Cir.1999) (quoting *Harner v. Prudential–Bache Securities, Inc.*, No. 92–1353, 1994 WL 494871, *4, 1994 U.S.App. LEXIS 25266, at *13 (6th Cir. Sept. 9, 1994)) (internal citations omitted). In other words:

> [T]he plaintiff need not have before him all the facts necessary to establish that a statement was untrue or omitted before the limitations period accrues. Once a plaintiff is in possession of facts sufficient to make him suspicious, or that

---

1. While some circuits speak of the "probability" of fraud, *see, e.g., Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir.1993), the Sixth Circuit and several others have consistently phrased the requirement in terms of the "possibility" of fraud, *Isaak v. Cortland Savings*, 169 F.3d 390, 399 (6th Cir.1999) (quoting *Harner v. Prudential–Bache Securities, Inc.*, No. 92–1353, 1994 WL 494871, *4, 1994 U.S.App. LEXIS 25266, at *13 (6th Cir. Sept. 9, 1994); *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir.1993)) (citing to *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802 (1st Cir.1987)); *Theoharous v. Fong*, 256 F.3d 1219, 1228 (11th Cir.2001) (citing to *Sterlin v. Biomune Systems*, 154 F.3d 1191, 1203 (10th Cir.1998)).

ought to make him suspicious, he is deemed to be on inquiry notice. *Harner v. Prudential Securities, Inc.,* 785 F.Supp. 626, 633 (E.D.Mich.1992), *aff'd sub nom. Harner v. Prudential–Bache Securities, Inc.,* No. 92–1353, 1994 WL 494871, 1994 U.S.App. LEXIS 25266 (6th Cir. Sept. 9, 1994).

■ "Storm warnings" include "any indication[s] in . . . [corporate] communications that could reasonably be considered contrary to the rosy predictions that the Plaintiffs claim were misrepresentations." *Harner,* 785 F.Supp. at 634; *see also Havenick v. Network Express, Inc.,* 981 F.Supp. 480, 521 (E.D.Mich.1997) (defining "storm warnings" as "any substantial or concrete indication of serious problems ahead for the company which were reflected in either the Form 10–K Report, the Prospectus, or subsequent press releases and reports which could reasonably be considered contrary to the optimistic statements and predictions that Plaintiffs claim were fraudulent").[2] What constitute "storm warnings" in any given context must depend upon the plaintiff's theory of fraud—i.e., what false statements or omissions the plaintiff claims the defendant made, and the reasons the statements were false or the omissions fraudulent. *See New England,* 336 F.3d at 502 (noting that the court could find no reason the plaintiff should not have discovered that auditors had knowingly or recklessly participated in the corporation's fraud "in light of the particular allegations against" the corporation). This Court nevertheless finds it instructive to note that courts considering allegations similar to Plaintiffs' have found both reserve charges and bank-

ruptcies, each in combination with other troubling corporate actions or adverse disclosures, to be elements of the "storm warnings" triggering inquiry notice. *LC Capital,* 318 F.3d at 155; *Theoharous v. Fong,* 256 F.3d 1219, 1228 (11th Cir.2001).

In *LC Capital,* the plaintiffs alleged that the corporation was under-reserved but issued financial reports and other public statements that, in the words of the court, "essentially [said] 'all is well.'" *LC Capital,* 318 F.3d at 150–51. The corporation disclosed reserve charges of "$17.5 million in 1994, $40 million in 1997, and $139 million in 1998." *Id.* at 155. The Second Circuit noted that "[m]any companies take one-time charges to reflect unanticipated developments without creating any suspicion of impropriety, but a series of three charges in substantial and increasing amounts for the same purpose within four years should alert any reasonable investor that something is seriously wrong." *Id.* Also contributing to the "storm warnings" were a news article discussing the corporation's reserve problems and a 1994 securities class action filed after the first reserve charge was announced. *Id.*

In *Theoharous,* the plaintiffs claimed the corporation's predictions of financial growth despite bad business were fraudulent. *Theoharous,* 256 F.3d at 1223. In August of 1997, the company announced it had been having cash flow problems and was suspending manufacturing operations. *Id.* at 1228. One week later it filed for bankruptcy. *Id.* The Eleventh Circuit held that "[t]hese facts were sufficient to put [the plaintiff who had filed her complaint more than one year after the bank-

---

**2.** Plaintiffs have cited several cases from the Southern District of New York claiming that "courts have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements." *Milman v. Box Hill Sys. Corp.,*

72 F.Supp.2d 220, 229 (S.D.N.Y.1999); *see also Phillips v. Kidder, Peabody & Co.,* 782 F.Supp. 854, 864 (S.D.N.Y.1991). Such concerns are necessarily misplaced where, as here, the "positive statements" are the very statements the plaintiffs claim are fraudulent.

ruptcy] on inquiry notice of the possibility that [the corporation] had violated Section 10(b) with its prior assurances of financial health." *Id.*

■ The securities fraud limitations period may start to run even where investors lack direct evidence that the potentially fraudulent statements were made with the requisite scienter. *New England,* 336 F.3d at 502; *Theoharous,* 256 F.3d at 1228. In *Theoharous,* the time-barred plaintiff claimed she was not put on inquiry notice of the fraud at the time the corporation disclosed financial difficulties and declared bankruptcy because, at that time, she could not have known the individual defendants acted with scienter. *Theoharous,* 256 F.3d at 1228. The Eleventh Circuit held that the plaintiff's argument failed because the inquiry notice standard did not require the plaintiff to " 'have fully discovered the nature and extent of the fraud.' " *Id.* (quoting *Sterlin v. Biomune Systems,* 154 F.3d 1191, 1203 (10th Cir. 1998)). Evidence of the possibility of fraud sufficed, and the plaintiff's complaint was time-barred. *Id.*

■ Finally, when the underlying facts are undisputed, as they are at this stage, in which the Court must take as true the allegations in Plaintiffs' complaint, the Court may decide as a matter of law whether Plaintiffs were put on inquiry notice. *See Brumbaugh,* 985 F.2d at 162.

In this case, as in *LC Capital,* the gravamen of the Plaintiffs' complaint is that the Defendants represented that "all is well" with the NSP and OC's asbestos reserves, while omitting facts indicating that the NSP was in trouble and the company's financial stability was in jeopardy. Plaintiffs claim Defendants represented that the NSP was working, was on track, was making liability and cash flow predictable, and was lowering the average settlement amount, and that the company was on

track to pay off the initial settlements and could cover both OC's and Fibreboard's liabilities with existing reserves.

Plaintiffs claim they could not have known those statements were fraudulent until September 12, 2002, when they learned, through the efforts of the Owens Corning bankruptcy creditors' committee, the details of the March 12, 2000 meeting between Defendant Smith and the NSP lawyers, at which Ms. Smith divulged that the Initial Settlements exceeded the company's ability to pay by $500 million, that the Fibreboard trust would run out of money early, that the NSP was oversubscribed, and that the company's financial stability depended on the requested deferrals. However, Plaintiffs need not have known the entire extent of the alleged fraud to have been placed on inquiry notice. Rather, Plaintiffs were under a duty to investigate when they became aware of "storm warnings"—corporate communications contrary to the company's positive assertions that should have made Plaintiffs suspect the possibility of fraud.

■ No later than November 14, 2000, Plaintiffs were aware of "storm warnings" that, taken together, were sufficient to put them on notice of the possibility that Defendants' positive statements were fraudulent, i.e., that the NSP did not make OC's asbestos liability predictable and that the cost of the Initial Settlements was greater than the company had estimated and more than it could afford. First, Defendants disclosed that OC sought a deferral of $500 million of scheduled payments on OC Initial Settlements, in order to keep payments to the previously stated estimates. Second, Defendants disclosed in April of 2000 that OC was taking a $1 billion charge to increase its asbestos reserves. Third, OC filed for bankruptcy in October, 2000, blaming its asbestos liabili-

ties. Finally, in November, 2000, Defendants disclosed that OC had sought but not received a deferral of Fibreboard's settlement obligations.

While Plaintiffs were perhaps not then aware of the full extent of the fraud they now allege, their knowledge in the fall of 2000 that OC had sought to defer $500 million of scheduled NSP payments and took a single but quite large reserve charge to increase its asbestos reserves by $1 billion, and that, despite these tactics, OC filed for bankruptcy due to its inability to manage its asbestos liability, should have made Plaintiffs suspicious of the Defendants' claims that the NSP was a success and that OC could manage its NSP obligations. Plaintiffs were aware that payments on all settlements beyond the Initial Settlements had been deferred until 2003. OC's 2000 deferral, reserve charge, and asbestos-related bankruptcy, should therefore have specifically suggested to Plaintiffs the possibility that Defendants claims that OC's reserves were adequate to cover the Initial Settlements were fraudulent. Finally, the disclosure that OC had sought and not received a deferral for Fibreboard's 2000 NSP payments should have cast suspicion on Defendants' prior assurances that the Fibreboard trust was adequate. These "storm warnings" may "reasonably be considered contrary" to the "rosy" statements Plaintiffs claim were misrepresentations and, even though Plaintiffs may have lacked knowledge of scienter on the part of the Defendants, were enough to place Plaintiffs under a duty to investigate the possibility of fraud.

Plaintiffs fail to allege that they conducted any investigations prior to learning about the March 12, 2000 meeting in September of 2002. Therefore, knowledge of the alleged fraud is imputed to Plaintiffs as of the date the duty to investigate arose, which the Court has determined to

be no later than November 14, 2000. Because Plaintiffs were on inquiry notice of their Section 10(b) and Rule 10b–5 claims no later than November of 2000, their lawsuit, filed in January of 2003, is time-barred under either the pre-Sarbanes-Oxley one-year statute of limitations or the post-Sarbanes-Oxley two-year statute of limitations.

### D.  Section 20(a) Claim

█ Section 20(a) provides that a person who controls any person liable under the 1934 Act is jointly and severally liable with and to the same extent as the controlled person. 15 U.S.C. § 78t(a); *Herm v. Stafford,* 663 F.2d 669, 679 (6th Cir. 1981). Plaintiffs claim Defendants were controlling persons of Owens Corning and are therefore liable for its violations of Section 20(a) and Rule 10b–5. Because Section 20(a) claims are by nature derivative, the same one-year statute of limitations applicable to Plaintiffs' Section 10(b) and Rule 10b–5 claims applies to their claims under Section 20(a). *Herm,* 663 F.2d at 679; *Theoharous v. Fong,* 256 F.3d 1219, 1228 (11th Cir.2001).

Plaintiffs clearly knew the identities and positions of each alleged controlling person no later than they were aware of any of the other facts necessary to put them on notice of their securities fraud claims. Moreover, the conclusions set out above as to the Section 10(b) and Rule 10b–5 claims apply equally to any derivative Rule 20(a) claims. The Court therefore concludes, without addressing any other deficiencies the Section 20(a) claim may possess, that Plaintiffs' Section 20(a) claim is likewise time-barred.

### Conclusion

Based on the foregoing, Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint (Doc. No. 44) is granted. Plaintiffs' Motion to Modi-

fy the PSLRA Discovery Stay (Doc. No. 67) is denied as moot.

IT IS SO ORDERED.

### JUDGMENT ENTRY

For the reasons stated in the Memorandum Opinion filed contemporaneously with this entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint (Doc. No. 44) is granted.

FURTHER ORDERED that Plaintiffs' Motion to Modify the PSLRA Discovery Stay (Doc. No. 67) is denied as moot.